Filed 7/21/16

# IN THE SUPREME COURT OF CALIFORNIA

| | |
|---|---|
| PROPERTY RESERVE, INC., ) | |
| ) | |
| Petitioner, ) | |
| ) | S217738 |
| v. ) | |
| ) | Ct.App. 3 C067758 |
| THE SUPERIOR COURT OF SAN JOAQUIN ) | San Joaquin County Super. Ct. |
| COUNTY, ) | JCCP No. 4594 |
| ) | |
| Respondent; ) | |
| ) | |
| DEPARTMENT OF WATER RESOURCES, ) | |
| ) | |
| Real Party in Interest. ) | |
| ————————————————————————) | |
| ) | |
| CAROLYN A. NICHOLS, as Trustee, etc. et al., ) | |
| ) | |
| Petitioners, ) | |
| ) | Ct.App.3 C067765 |
| v. ) | San Joaquin County Super Ct. |
| ) | JCCP No. 4594 |
| THE SUPERIOR COURT OF SAN JOAQUIN ) | |
| COUNTY, ) | |
| ) | |
| Respondent; ) | |
| ) | |
| DEPARTMENT OF WATER RESOURCES, ) | |
| ) | |
| Real Party in Interest ) | |
| ————————————————————————) | |
| ) | Ct.App.3 C068469 |
| DEPARTMENT OF WATER RESOURCES CASES.) | San Joaquin County Super. Ct. |
| ————————————————————————) | JCCP No. 4594 |

In an effort to improve the reliability of the water supply system in

California as well as to address environmental and ecological concerns, the

**SEE CONCURRING OPINION**

California Department of Water Resources (hereafter, the Department) undertook to investigate the feasibility of constructing a new tunnel or canal in the Sacramento-San Joaquin Delta as a means of delivering fresh water from Northern California to Central and Southern California. As part of the preliminary steps in going forward with the project, the Department sought to conduct environmental and geological studies and testing on more than 150 privately owned parcels of land that the state, in the future, might seek to acquire for the project through negotiation or eminent domain.

In pursuing the proposed studies and testing, the Department proceeded through the specific statutory procedure established by the California Eminent Domain Law (Code Civ. Proc., pt. 3, tit. 7) relating to precondemnation entry and testing. (Code Civ. Proc., §§ 1245.010-1245.060.)[1] The Department filed petitions in superior court relating to the privately owned properties, seeking a court order granting the Department authority to enter the properties and undertake various environmental and geological testing activities. The Department maintained that these activities were necessary to determine the suitability of each property for the project and to comply with the numerous state and federal environmental laws governing such a project.

After a four-day hearing, the trial court issued a detailed and lengthy order authorizing the Department to enter all of the private properties and conduct various *environmental* studies and testing under specified limitations. After a

---

[1] Unless otherwise indicated, subsequent statutory references are to the Code of Civil Procedure. For convenience, this opinion generally refers, collectively, to the provisions of the Eminent Domain Law at issue here — sections 1245.010 to 1245.060 — as the precondemnation entry and testing statutes, and refers to the activities authorized in those statutes, collectively, as testing activities or testing.

2

separate hearing, the trial court denied the Department's request to conduct *geological* testing — testing that contemplated the drilling and refilling of deep test holes on certain properties in question — on the ground that the Department's authority to conduct that drilling could be obtained only through a classic condemnation action rather than through the statutory precondemnation procedure.[2]

Both the landowners and the Department sought review of the trial court's rulings in the Court of Appeal. The Court of Appeal, in a two-to-one decision, upheld the trial court's denial of the Department's request to enter and to conduct geological testing, but reversed the trial court's grant of authority to conduct environmental testing. The majority in the Court of Appeal concluded (1) that the procedure established by the precondemnation entry and testing statutes does not satisfy the demands of the takings clause of the California Constitution with regard to any precondemnation entry and testing activity that would constitute a taking or damaging of property within the meaning of the state takings clause, and (2) that both the geological testing sought by the Department and the environmental activities authorized by the trial court fell within that category. The Court of Appeal majority held that in order to conduct such activities, the Department was required to proceed to condemn a temporary easement through a classic

_____

[2]    One issue in this case is whether the judicial proceeding provided by the precondemnation entry and testing statutes constitutes an "eminent domain proceeding[]" as that term is used in the California takings clause — article I, section 19, subdivision (a) of the California Constitution. (See *post*, p. 54, fn. 20.) To avoid confusion, this opinion refers to the judicial proceeding that the Eminent Domain Law prescribes for the condemnation of property (see § 1250.110 et seq.) as a classic condemnation action or proceeding, and to the judicial proceeding provided by the precondemnation entry and testing statutes as a precondemnation proceeding.

condemnation action, rather than proceeding by means of the procedure established by the precondemnation entry and testing statutes.

The Department sought review of the Court of Appeal decision in this court. We granted review and posed three questions for briefing and argument: (1) Do the geological testing activities proposed by the Department constitute a taking? (2) Do the environmental testing activities authorized by the trial court's order constitute a taking? (3) If so, do the precondemnation entry and testing statutes provide a constitutionally valid eminent domain proceeding for the activities?

For the reasons set forth below, we conclude that there is no need to determine under the first two questions whether the authorized environmental testing activities or the proposed geological testing activities constitute a taking or damaging of property for purposes of the state constitutional takings clause. (Cal. Const., art. I, § 19, subd. (a).) Assuming, without deciding, that both the environmental and the geological activities in question amount to a taking or damaging of property for which just compensation must be paid under the California takings clause, we conclude that in answer to our third question the procedure established by the precondemnation entry and testing statutes satisfies the requirements of the California takings clause when the procedure is reformed to comply with the jury trial requirement of that clause. As we explain, the precondemnation entry and testing statutes (1) require a public entity, before undertaking such entry and testing, to seek and obtain a court order specifically authorizing the activities that are to be conducted on the property and to deposit in court an amount that the court determines is the probable compensation for the authorized activities, and (2) permit the property owner to obtain damages in the same proceeding for any actual damage and substantial interference with the possession or use of the property caused by the public entity's entry and testing

4

activities.  This procedure satisfies the California takings clause when reformed to permit the property owner to obtain a jury determination of damages in the proceeding if the property owner so chooses.

Accordingly, we conclude that the Court of Appeal judgment should be reversed in its entirety, both insofar as the Court of Appeal affirmed the trial court's denial of the Department's proposed geological testing and insofar as it reversed the trial court's authorization of environmental testing.

## I.  Facts and Proceedings Below

In this case, the Department proposed to enter more than 150 privately owned properties in the Sacramento-San Joaquin Delta area (Delta) in order to conduct environmental and geological studies and testing needed to investigate the feasibility of adding new water conveyance facilities — such as tunnels or additional canals — in the Delta and to determine the suitability of potential alternative routes for the contemplated project.  The proposed new facilities would become part of the Bay Delta Conservation Plan and are intended to improve the reliability of the water supply statewide as well as to restore the Delta ecosystem and native fish populations.[3]

---

[3]    The contemplated project would be a component of the State Water Project, a statewide water storage and delivery system that is made up of reservoirs, aqueducts, and power and pumping plants.  The main purpose of the State Water Project is to store and distribute water to urban and agricultural water suppliers in Northern California, the San Francisco Bay Area, the San Joaquin Valley, the Central Coast, and Southern California.  According to the Department's Web site, approximately 70 percent of the contracted water supply goes to urban users and 30 percent to agricultural users.  (Dept. of Wat. Resources, State Water Project, online at <http://www.water.ca.gov/about/swp.cfm> [as of July 21, 2016].)

Because the alternative potential locations for the new facilities cross or lie beneath privately owned lands, the Department sought to enter the private properties in question to ascertain preliminary environmental and geological information about the properties. The Department maintains that the proposed entries and testing are necessary for two reasons: (1) to determine the feasibility and best potential location for the contemplated conveyance system, and (2) to assess the potential effects of the project on biological, environmental, geological, and archeological resources within the properties in order to comply with numerous applicable state and federal environmental laws, including the California Environmental Quality Act, the National Environmental Policy Act, the California Endangered Species Act, the Federal Endangered Species Act, the Federal Clean Water Act, and the California Porter-Cologne Water Quality Act.

Between 2008 and 2009, the Department filed more than 150 separate petitions in superior court pursuant to section 1245.030, seeking entry onto properties located in five separate counties — San Joaquin, Contra Costa, Solano, Yolo, and Sacramento. In June 2009, the Department filed a request to coordinate in a single proceeding the numerous entry petitions at issue here, and in March 2010, the superior court granted the request, coordinating the petitions in a single proceeding before the San Joaquin County Superior Court.

In September 2010, the Department filed a "Master Amended Petition" in which it sought authority to conduct what the petition characterized collectively as "environmental activities" with respect to all properties and "geological activities" with respect to 35 properties. The proposed environmental activities consisted of mapping and surveys relating to plant and animal species, habitat, soil conditions, hydrology, cultural and archeological resources, utilities, and recreational uses. The proposed geological activities consisted of drilling deep holes or borings to determine subsoil conditions. The Master Amended Petition attached declarations

6

from environmental managers, planners, and surveyors employed by the Department, describing the scope and purpose of the proposed testing activities.

Thereafter, at a case management conference in October 2010, the trial court bifurcated the upcoming hearing on the Master Amended Petition, setting an initial hearing limited to the proposed environmental activities and a subsequent hearing for the proposed geological activities. The court indicated that it had reviewed the numerous declarations that had already been submitted on behalf of many landowners describing concerns with the Department's proposed activities, and invited any property owner, prior to the upcoming hearings, to present additional evidence by declaration regarding any property-specific issues that could affect the scope of any order the court might ultimately issue. The court also directed the Department to be prepared to produce witnesses at the hearings who would testify in person with regard to the nature and scope of the proposed entries and activities and who would be subject to cross-examination by the court and landowners.

**A. Environmental activities hearing and order**

In December 2010, and January and February 2011, the trial court held a hearing on the proposed environmental activities. It considered the declarations filed on behalf of the Department and the landowners, and the in-person testimony of a number of Department employees, as well as suggestions, concerns and objections raised by the landowners and the Department to a series of tentative orders drafted by the court. On February 22, 2011, the trial court issued a detailed 33-page order granting the Department limited authority to enter each of the parcels at issue to conduct the various types of environmental testing sought by the Department. The order stated that "[t]he court has determined the nature and scope of the activities reasonably necessary to accomplish the purposes identified, taking due consideration of constitutional limitations and statutory procedures

7

required for a taking of property.  The court has provided suitable limitations to strike the best possible balance between the needs of [the Department] and the interests of the property owners."

In brief summary, the order authorized Department employees to enter each property[4] for a maximum of 25 to 66 days (depending on property size) over a one-year period in order to conduct the designated environmental survey, sampling, and testing activities (recreational, botanical, hydrolic, general, habitat, vernal pool, archeological and utility surveys, and mapping activities) under specific conditions and limitations set forth in the order with regard to each type of activity.[5]  The authorized environmental activities generally would be conducted by walking, visual observation, minor soil and plant sampling and testing,

---

[4]     The order defined "a property" for purposes of the order as "an enterprise unit such as a single ranch, even though comprised of several [assessed parcels]."

[5]     As an example of the detailed nature of the order, the portion of the order relating to botanical surveys states:  "1.  Activities will consist of identifying existing plants and characterizing the vegetation community; evaluating existing vegetation for its suitability as habitat for special status species; visually characterizing the soil and the existing substrate; and identifying wildlife for signs of certain special status species.  Activities will include walking the subject property to assess the habitat and determine the presence or absence of sensitive plant species; collecting samples of vegetation; recording locations using handheld Global Positioning System (GPS) equipment; photographing landscape and vegetation; digging holes with a trowel or shovel approximately two feet wide and two feet deep to examine soil.  After examination, soil will be used to refill the hole from which it came so that it is placed as close as possible to its original condition.  Soil samples will not be taken from the subject properties.  Watersides of larger sloughs and rivers and in-stream islands may require surveys by small boat.  [¶]  2.  All surveys and delineations will be conducted during daylight hours during the months of February through October.  Between 2 and 6 personnel identified by DWR will require 1 to 12 days to survey each parcel concurrently with hydrologic and general survey activities, and an additional 1 to 4 days if wetlands are found."

photography, and trapping and releasing small animals. The entries would be on foot where practicable, and any vehicle use would be restricted to existing roads.

The order required the Department to give a landowner 72-hour advance notice before each entry, prohibited any entry on agricultural land during harvest season or on hunting land during hunting season, limited the number of persons per entry (two-to-eight persons) by property size, specified the time of day the activities could be conducted (generally between 7:00 a.m. and 7:00 p.m.), and provided that most of the authorized activities were to be conducted concurrently in order to reduce the total number of days Department employees would be on the property. No equipment could be left on the property between entries with the exception of small traps that could be left for 14 days and small cloth targets for aerial mapping that could remain on the property for between 30 and 38 days (depending on property size).[6] The order prohibited any inspection of or entry within 100 feet of an inhabited dwelling, as well as any entry into any other structures that are not open to the public. The order also contained a schedule of general conditions, relating to indemnification, confidentiality, disclosure of gathered information to landowner, and other matters.

Finally, the order set forth a schedule designating by property size the amount of probable compensation that the Department was required to deposit prior to entering any property to conduct the authorized environmental activities. Under the order, the amount of probable compensation to be deposited ranged from $1,000 per property for properties of 100 acres or fewer to $6,000 per property for properties of 3,501 to 8,500 acres.

_____

[6] The order specified that the presence of traps or targets on the ground was not to be considered a day of entry for purposes of the maximum days of entry per property.

**B. Geological activities hearing and order**

After issuing its order relating to the environmental activities, the trial court held a hearing over a number of days in February, March, and April 2011, concerning the proposed geological testing. In declarations and testimony, Department employees explained that geological tests were needed on 35 properties in order to determine the suitability of the subsurface of those properties for several alternative potential alignments of surface canals or underground water conveyance tunnels.

Two engineering geologists employed by the Department testified in some detail with regard to the testing protocol. For each property, the process would generally begin with a two- or three-day entry to determine, in consultation with the property owner and utility and reclamation district personnel, the best location for the drilling operations, taking into account existing uses of the property and the location of underground utilities. The geologists testified that the sites of the drilling initially suggested by the Department could be adjusted within the proposed alignment of the project, and that the goal would be to find locations for the drilling along existing roads and turnouts in order to minimize any damage or interference with the landowner's ongoing uses of the property.

Once the optimal sites for drilling were determined, the Department would first conduct "cone penetrometer testing" (CPT) on each of the 35 properties. CPT involves pushing into the ground a long rod that emits signals to determine the subsurface composition of the tested land. The CPT creates a hole that is one and one-half inches in diameter and up to 205 feet in depth, and that is refilled after the rod is withdrawn. The CPT process generally requires four persons and up to four vehicles (including a five-ton or 25-ton CPT truck) and a portable toilet, and is generally completed in a single day. Thus, on properties that the Department proposed to conduct only CPT, the Department's proposed geological activities

generally would be completed in a total of no more than four working days, including the preliminary identification of the site location.

With respect to 28 of the 35 properties, the Department geologists indicated that, in addition to the CPT process, the Department would need to drill additional, larger "soil borings" or "drill holes" that would generally be located within five feet of the CPT hole. The soil borings or drill holes would range from three and seven-tenths to eight inches in diameter, would reach up to 205 feet in depth, and would be refilled once the drilling and retraction of soil for sampling was completed. The geologists testified that the drilling of drill holes generally requires a five-person crew and larger and more equipment than the CPT (generally including a drilling rig, forklift, support trucks, 55-gallon storage drums, a mudbox, and a portable toilet). They further testified that in undertaking this type of drilling the Department would need to use an area of approximately 100 feet by 100 feet as a worksite[7] for a period of between five and 10 days (depending upon the depth of the drilling), a period that would include the time for setting up and taking down the drilling rig as well as the actual drilling. Accordingly, with regard to the 28 properties on which both the CTP and drill holes would be conducted, the geological testing activities generally would require the Department to be engaged on each property for no more than a total of 14 working days.

The geologists further testified that, with respect to both the CPT and drill holes, the top two to five feet of the holes would be refilled with native topsoil, to restore the surface area as closely as possible to its original condition. In

---

[7] The Department employees testified that the worksite could be stretched alongside a roadway if needed to avoid drilling in fields.

11

accordance with current California regulations, the lower depths of the CPT holes and the drill holes would be refilled with bentonite grout. As described by the geologists, bentonite grout hardens into a type of cement, but because it lacks the aggregate materials (sand and gravel) found in concrete, bentonite grout when hardened is similar in texture to the native subsurface material that it would replace, is soft enough to be shaved with a pen knife, would not interfere with or damage farm machinery, and would not adversely affect the filled land for agricultural or other purposes. The geologists explained that bentonite grout is used in order to provide stability and avoid groundwater contamination. An expert witness testifying on behalf of landowners raised no objection to the Department's proposed use of bentonite grout and described such use as "textbook sealing."

After considering the evidence regarding the factual nature and scope of the proposed geological activities as well as briefing by all parties regarding the constitutional issues raised by those proposed activities, the trial court issued an order denying the Department's petition as it related to the proposed geological activities. The trial court's order relied heavily upon this court's 1923 decision in *Jacobsen v. Superior Court* (1923) 192 Cal. 319 (*Jacobsen*), which denied a public entity's request to conduct somewhat similar drilling activities under an earlier precondemnation entry statute. (We discuss the *Jacobsen* decision in detail below, *post*, pp. 20-24.) The trial court acknowledged that the current precondemnation entry and testing statutes were enacted by the Legislature after the *Jacobsen* decision and include boring among the precondemnation activities explicitly covered by those statutes. Nonetheless, the court denied the order for the following reasons: the current statute does not explicitly state that it is intended to apply to the type of deep drilling involved in *Jacobsen* and the present case; *Jacobsen* concluded that such drilling activity would constitute a taking or damaging of property for purposes of the California taking clause; and because the

12

precondemnation entry and testing statutes do not satisfy the requirements of the state takings clause, the precondemnation entry and testing statutes should not be interpreted to authorize this type of drilling activity.

### C. Court of Appeal Proceedings

Prior to the entry of the trial court's geological testing order, the landowners initially filed two petitions for writs of mandate, prohibition, or other appropriate relief in the Court of Appeal, challenging the trial court's environmental testing order and seeking a stay of that order. The appellate court initially summarily denied the writ petitions, but this court granted review and directed the Court of Appeal to order the Department to show cause why the writs should not issue.

In the meantime, after the entry of the trial court's geological testing order, the Department appealed the trial court judgment insofar as it denied entry to conduct the proposed geological activities and the landowners appealed the judgment insofar as it authorized entry to conduct the environmental activities. The Court of Appeal stayed the environmental testing order and consolidated the writ petitions and appeals for hearing and decision.

After briefing and argument, the Court of Appeal, in a two-to-one decision, affirmed the trial court order insofar as it denied the Department's petition to conduct geological activities, but reversed the trial court order insofar as it granted the Department authority to conduct the environmental activities. The majority in the Court of Appeal, relying heavily on this court's 1923 decision in *Jacobsen*, *supra*, 192 Cal. 319, concluded that the current precondemnation entry and testing statutes would be constitutionally valid if the statutes were interpreted to authorize only those precondemnation entry and testing activities that are sufficiently "innocuous" and "superficial" that they do not constitute a taking or damaging of property within the meaning of the California takings clause. Because, in the

13

majority's view, the proposed geological activities "will result in permanent structures being placed in the ground on the affected landowners' properties," the majority concluded that such activities constituted a per se taking of property for purposes of both the federal and state takings clauses.  And in light of the duration and scope of the environmental activities authorized by the trial court order — permitting entry and surveying throughout each property for between 25 to 66 days in a one-year period — the majority concluded that the environmental order effectively granted the Department "a temporary blanket easement for one year." Such an easement, the Court of Appeal concluded, constituted a compensable property interest for purposes of the federal and state Constitutions' takings clause. The majority rejected the Department's contention that even if the geological and environmental activities constitute a taking or damaging of property for purposes of the California takings clause, the procedural requirements established by the current precondemnation entry and testing statutes satisfy the demands of the state takings clause.  The majority found the statutory procedure constitutionally deficient in several respects.  It determined that the Department was required to institute a classic condemnation proceeding for a temporary easement in order to obtain the authority to undertake the precondemnation environmental and geological testing activities at issue here.

One Court of Appeal justice dissented, concluding that neither the environmental activities authorized by the trial court nor the geological activities proposed by the Department — because of their temporary nature and very limited economic impact — constituted a taking or damaging of property for purposes of the California takings clause.  Furthermore, the dissenting justice concluded that, in any event, the procedure embodied in the precondemnation entry and testing statutes satisfies the requirements of the state takings clause.

14

The Department sought review of the Court of Appeal decision in this court. We granted review to decide the significant issues posed by this case.

## II. Current Precondemnation Entry and Testing Statutes

Before discussing the specific issues raised in this case, we begin with an overview of the precondemnation entry and testing statutes contained in California's Eminent Domain Law. (§§ 1245.010-1245.060.)

Section 1245.010 sets forth the general authority granted to public entities by the precondemnation entry and testing statutes. It provides: "Subject to requirements of this article, any person authorized to acquire property for a particular use by eminent domain may enter upon property to make photographs, studies, surveys, examinations, tests, soundings, borings, samplings, or appraisals or to engage in similar activities reasonably related to acquisition or use of the property for that use." (*Ibid.*)

Section 1245.020 establishes the circumstances under which the property owner's consent or, alternatively, a court order is required before a public entity can enter property to conduct precondemnation testing. The section provides: "In any case in which the entry and activities mentioned in Section 1245.010 will subject the person having the power of eminent domain to liability under Section 1245.060, before making such entry and undertaking such activities, the person shall secure: [¶] (a) The written consent of the owner to enter upon his property and to undertake such activities; or [¶] (b) An order for entry from the superior court in accordance with Section 1245.030." (*Ibid.*) In this case, the Department has acknowledged that either the consent of the property owner or a court order is required under this provision before it may enter and conduct the proposed activities at issue here.

Section 1245.030 sets forth the procedure governing an order for entry. The section provides: "(a) The person seeking to enter upon the property may

15

petition the court for an order permitting the entry and shall give such prior notice to the owner of the property as the court determines is appropriate under the circumstances of the case. [¶] (b) Upon such petition and after such notice has been given, the court shall determine the purpose for the entry, the nature and scope of the activities reasonably necessary to accomplish such purpose, and the probable amount of compensation to be paid to the owner of the property for the actual damage to the property and interference with its possession and use. [¶] (c) After such determination, the court may issue its order permitting the entry. The order shall prescribe the purpose for the entry and the nature and scope of the activities to be undertaken and shall require the person seeking to enter to deposit with the court the probable amount of compensation." (*Ibid.*)

Although section 1245.030 does not explicitly require the trial court to hold a hearing and afford the property owner an opportunity to present evidence relevant to the factors that the court is required to consider under section 1245.030, we conclude a hearing and an opportunity to be heard on a public entity's entry petition is clearly contemplated by and implicit in the statutory scheme. The notice to the property owner required by section 1245.030 would make little sense if the owner had no ability to respond to the notice and make its views known prior to the issuance of any order, and the very next section — section 1245.040 — explicitly provides that the court may modify any order entered under section 1245.030 "after notice *and hearing*" (§ 1245.040, subd. (a), italics added). In the present case, as we have seen, the trial court held extensive hearings on the Department's petition and afforded the property owners the

16

opportunity to participate in the hearings. We conclude the trial court did not err in so doing.[8]

Section 1245.040 authorizes the trial court, after notice and hearing, to modify any order entered under section 1245.030 and to require the public entity to deposit additional funds if it determines the initial deposit is inadequate. The section provides: "(a) The court, after notice and hearing, may modify any of the provisions of an order made under Section 1245.030. [¶] (b) If the amount required to be deposited is increased by an order of modification, the court shall specify the time within which the additional amount shall be deposited and may direct that any further entry or that specified activities under the order as modified be stayed until the additional amount has been deposited." (*Ibid.*)

Section 1245.050 governs the deposited funds. It provides: "(a) Unless sooner disbursed by court order, the amount deposited under this article shall be retained on deposit for six months following the termination of the entry. The period of retention may be extended by the court for good cause. [¶] (b) The deposit shall be made in the Condemnation Deposits Fund in the State Treasury, or, upon the written request of the plaintiff filed with the deposit, in the county treasury. . . ." (*Ibid.*)

Finally, section 1245.060 addresses the property owner's right to recover damages. The section provides: "(a) If the entry and activities upon property cause actual damage to or substantial interference with the possession or use of the property, whether or not a claim has been presented in compliance with [the Tort Claims Act presentation requirements], the owner may recover for such damage or interference in a civil action or by application to the court under subdivision (c).

---

[8]    Because the issue is not before us, we have no occasion in this case to consider the type or form of hearing that is required under section 1245.030.

17

[¶] (b) The prevailing claimant in an action or proceeding under this section shall be awarded his costs and, if the court finds that any of the following occurred, his litigation expenses incurred in proceedings under this article: [¶] (1) The entry was unlawful. [¶] (2) The entry was lawful but the activities upon the property were abusive or lacking in due regard for the interests of the owner. [¶] (3) There was a failure substantially to comply with the terms of an order made under Section 1245.030 or 1245.040. [¶] (c) If funds are on deposit under this article, upon application of the owner, the court shall determine and award the amount the owner is entitled to recover under this section and shall order such amount paid out of the funds on deposit. If the funds on deposit are insufficient to pay the full amount of the award, the court shall enter judgment for the unpaid portion. [¶] (d) Nothing in this section affects the validity of any other remedy the owner may have for the damaging of his property." (*Ibid.*)

### III. Do the environmental and geological testing activities that the Department proposed to conduct on the landowners' properties fall within the scope of the current precondemnation entry and testing statutes?

We consider first the proper scope of the current precondemnation entry and testing provisions as a matter of statutory interpretation and legislative intent. In their briefing in this court, the landowners, relying upon the interpretation of an early California precondemnation entry statute in the 1923 *Jacobsen* decision (*Jacobsen*, *supra*, 192 Cal. 319), contend that the current entry and testing statutes are properly interpreted to authorize only innocuous entries and superficial testing. The landowners assert that the Department "overreached" and "urged a radical expansion" of the precondemnation entry and testing statutes in proposing to utilize the precondemnation statutory procedure to proceed with the type and amount of both environmental and geological activities sought to be conducted in this case. If, as the landowners maintain, the precondemnation entry and testing

18

statutes were not intended to encompass the extensive environmental and geological activities proposed by the Department, the Court of Appeal ruling against both the environmental and geological activities could be upheld on that statutory basis alone, and there would be no need to reach any constitutional issue. For the reasons explained hereafter, however, we conclude that both the language and the legislative history of the precondemnation entry and testing statutes demonstrate that the statutes were intended to apply to the types of precondemnation activities at issue here.

To begin with, the plain language of the governing statute, on its face, appears to encompass the testing activities that the Department proposed to conduct. As set forth above (*ante*, p. 15), section 1245.010 explicitly authorizes a public entity that is authorized to acquire property by eminent domain to enter the property "to make photographs, studies, surveys, examinations, tests, soundings, borings, samplings, or appraisals or to engage in similar activities reasonably related to acquisition or use of the property for that use." Nothing in the statutory language indicates that the statute was intended to apply only to innocuous or superficial surveys or testing. The explicit listing of "examinations, tests, soundings, *borings*, [and] samplings" (*ibid.*, italics added) without qualification reasonably suggests that the Legislature contemplated that the statute would apply to all of the designated testing activities that are reasonably necessary to determine whether the public entity should utilize its authority to acquire the property for the stated public purpose by use of eminent domain.

As noted, the landowners contend that the relevant language of section 1245.010 cannot be read in isolation but must be understood in light of this court's decision and holding in *Jacobsen*, *supra*, 192 Cal. 319. We agree that the *Jacobsen* decision provides a useful starting point for discerning the intended

19

scope of the current precondemnation entry and testing statutes and accordingly we review that decision in some detail.

In *Jacobsen*, *supra*, 192 Cal. 319, the Petaluma Municipal Water District was considering acquiring privately owned land as a possible site for a reservoir that was needed to supply water to the residents of Petaluma. At the time, the land in question was being used for the cultivation of hay, grain, and other crops and for the operation of a dairy. The landowners initially granted the district permission to make some surface surveys and examinations of the property, but objected when the district requested permission "to go upon their said lands with well-boring outfits, tools, machinery, and appliances for the purpose of boring holes and making excavations for the avowed object of ascertaining whether or not there was underneath the surface of . . . said lands rock strata or other formations suitable or necessary for the construction of dams and building of reservoirs . . . ." (*Id*. at p. 322.) The landowners maintained that the proposed activities "would result in substantial and irreparable injury to the . . . lands and crops and would be an invasion of their private property rights in their respective holdings." (*Ibid*.)

The water district then filed an action against the landowners in superior court, seeking an injunction to prohibit the landowners from preventing the district's employees from "entering upon or occupying" the property "for the purpose of making the excavations, borings, and subsoil examinations" described in the complaint. (*Jacobsen*, *supra*, 192 Cal. at p. 322.) The complaint identified the precise location of the proposed test holes and test pits and stated that the test holes would be from three to eight inches in diameter and 150 feet or more deep and that the test pit excavations would measure about four feet by six feet and be up to 15 feet in depth. The complaint noted that the proposed activities would require the presence on the landowners' property of four persons for a period of about 60 days with occasional visits from the district's officials. The complaint

further acknowledged that some of the locations in question contained growing crops of hay and grain that would be damaged or destroyed by the proposed activities. However, the complaint stated that upon completion of the activities the district "would restore the lands . . . to their original condition by filling in said test holes and excavations and by removing their appliances from said lands." (*Id.* at p. 323.) The trial court granted the injunction sought by the district, ordered the district to deposit $1,000 as security for any damage that might be caused to the property by the activities permitted by the order, and then stayed its order to give the landowners an opportunity to seek writ relief. (*Id.* at p. 324.)

The landowners sought writ relief in this court, maintaining that the trial court's injunctive order was invalid as a violation of the state constitutional takings clause, then set forth in article I, section 14 of the California Constitution (now art. I, § 19, subd. (a).). In analyzing the issue, the *Jacobsen* court observed at the outset that "[i]t is conceded by the respondents [i.e., the district] in their briefs . . . that if the entry upon and examination of the lands of the petitioners herein, as applied for and permitted in the above-mentioned action, would amount to the taking or damaging of petitioners' property within the meaning of section 14 of article I of the state constitution, the said order of the court would be violative of that provision of the constitution." (*Jacobsen*, *supra*, 192 Cal. at p. 324.) The court explained that the district's position was that the activities at issue would not amount to a taking or damaging of property for purposes of the state takings clause, but instead were acts that were permitted under the terms of the sole then-existing entry statute, former section 1242 of the Code of Civil Procedure (as enacted 1872). At the time, former section 1242 read in full: "In all cases where land is required for public use, the state, or its agents in charge of such use, may survey and locate the same; but it must be located in the manner which will be most compatible with the greatest public good and the least private injury, and

21

subject to the provisions of section twelve hundred and forty-seven.  *The state, or its agents in charge of such public use, may enter upon the land and make examinations, surveys, and maps thereof, and such entry shall constitute no cause of action in favor of the owners of the land, except for injuries resulting from negligence, wantonness, or malice.*"  (Code Civ. Proc. (Deering, edit. 1923) § 1242, p. 674, italics added.)

In considering whether the activities at issue in that case constituted the taking or damaging of property within the meaning of the state takings clause, the court in *Jacobsen* first reviewed the history of the state takings clause, explaining that the relevant constitutional provision was amended at the 1879 Constitutional Convention to add the words "or damaged" to the provision.  (*Jacobsen*, *supra*, 192 Cal. at pp. 326-327.)  The court then reviewed the activities the district proposed to undertake on the landowners' property and stated that the court "entertain[ed] no doubt" that the proposed acts amounted to a taking or damaging of property under the state takings clause.  (*Id.* at p. 328.)  The court observed in this regard:  "[The district] proposes to enter upon the petitioners' private lands, in advance or absence of any condemnation proceeding, with a force of employees and with mechanical structures operated by steam or gasoline enginery and with other appliances and implements suited to the execution of its intended purpose, which is that of making a number of test borings from three to eight inches in diameter and of a depth of 150 feet or more at various points upon petitioners' said lands, and also of making at other places thereon excavations of an area of four by six feet and of a depth of fifteen feet, and of occupying so much of said lands as shall be needed for ingress and egress and for accomplishment of the foregoing purposes, and of trampling down and destroying the growing grain of the petitioners over the area to be occupied during such operations, and of building fences around such test holes and excavations for the better protection thereof

pending such operations." (*Ibid.*)  The court concluded:  "It is idle to attempt to argue that such entry, occupation, disturbance, and destruction of the properties of these petitioners would not constitute such an interference with their exclusive rights to the possession, occupation, use, and enjoyment of their respective holdings as would amount to a taking and a damaging thereof to the extent and during the period of such entry upon said lands and of the operations of the [district] thereon." (*Ibid.*)

Finally, in response to the district's contention that the proposed activities in that case were authorized by the terms of former section 1242 — which, as we have seen, referred to the state's entry of land to "make examinations, surveys, and maps thereof" — the court in *Jacobsen* concluded that the statute could not properly be interpreted to apply to the district's proposed conduct.  The court stated in this regard:  "The opening sentence of the section apparently contemplates the existence and pendency of [condemnation] proceedings as a basis for whatever entry upon or examination of the lands of private owners affected thereby is permitted by the succeeding clauses of the section.  But however this may be, it is clear that whatever entry upon or examination of private lands is permitted by the terms of this section cannot amount to other than such innocuous entry and superficial examination as would suffice for the making of surveys or maps and as would not in the nature of things seriously impinge upon or impair the rights of the owner to the use and enjoyment of his property.  Any other interpretation would, as we have seen, render the section void as violative of the foregoing provisions of both the state and federal constitution." (*Jacobsen, supra*, 192 Cal. at p. 329.)  As already noted, at that time former section 1242 did not require a public entity to obtain prior judicial authorization or deposit funds before entering and conducting examinations, surveys, and mapping, and

23

permitted a landowner to maintain an action for damages only for an injury resulting from the public entity's negligence, wantonness, or malice.

The landowners in the present case contend that because the *Jacobsen* court concluded that the provisions of the entry statute at issue in that case — former section 1242 — were properly interpreted to apply only to innocuous entries and superficial examinations of private property, the current precondemnation entry and testing statutes should similarly be interpreted to apply only when the activities listed in the statutes are innocuous or superficial in intensity or scope. As we explain, the post-*Jacobsen* legislative history of the current statutes clearly refutes the landowners' proposed interpretation of the current statutes.

As we have seen, in *Jacobsen* the drilling and excavation activities were proposed by a water district that was investigating the suitability of the property in question for use as a site for a reservoir. In 1959, the Legislature enacted a new entry statute — former section 1242.5 — which applied specifically and exclusively to precondemnation entry and exploration intended to determine the suitability of property *for reservoir purposes*. (Stats. 1959, ch. 1865, § 1, pp. 4423-4424.) In context, it is evident that the statute was a direct legislative response to *Jacobsen*.

As enacted in 1959, former section 1242.5 authorized a public entity that has the power to condemn land for reservoir purposes to survey and explore property to determine its suitability for such use by complying with the requirements set forth in the statute. Under the 1959 version of former section 1242.5 — unlike the version of former section 1242 that was in effect at the time of *Jacobsen* — an entity empowered to condemn land for reservoir purposes was required to petition the superior court for permission to undertake such survey and exploration, and the superior court was required to ascertain whether the entry was sought in good faith for such purposes and to require the entity to deposit cash

24

security "in an amount sufficient to compensate the landowner for any damage resulting from the entry, survey, and exploration." (Stats. 1959, ch. 1865, § 1, p. 4423.)

Although the 1959 statute did not spell out the particular activities that were authorized under the statute, because the statute was directed specifically at exploration to determine a property's suitability as a reservoir site, it is clear that the legislation was intended to apply to the kind of deep drilling and excavations that are inevitably required in evaluating whether property is suitable for such a purpose. (See Van Alstyne, *Inverse Condemnation: Unintended Physical Damage* (1969) 20 Hast. L.J. 431, 510 (*Unintended Physical Damage*) ["Section 1242.5 was designed to meet the special problem of substantial property damage likely to occur from the kinds of technical operations, including soil tests, trenching, and drilling operations, often necessitated by reservoir investigations" (fn. omitted.)].)[9] The Legislature evidently was of the view that the additional requirements imposed by the 1959 legislation — which compelled the public entity to obtain judicial authorization and to deposit an amount sufficient to compensate the property owner for any damage resulting from the entity's activities prior to entering the property and conducting such activities — overcame the constitutional objections to a public entity's undertaking of such extensive precondemnation testing activities that had animated the *Jacobsen* decision.

---

[9]     A letter from the author of the bill to the Governor stated in this regard: "The land selected for reservoir purposes must be subjected to rather extensive exploration which includes core drilling and ditching to the bedrock to reveal any geologic faults or weaknesses that would make the land unsuitable for use as a reservoir. Under this bill, only the land that is proved suitable by exploration will be condemned." (Assemblyman S.C. Masterson, letter to Gov. Edmund G. "Pat" Brown, June 29, 1959.)

In 1969, the California Law Revision Commission published a report including a chapter entitled "Damages Arising From Entries for Survey and Examination" that dealt specifically with the subject at issue here. (Recommendation: Sovereign Immunity No. 10 — Revisions of the Governmental Liability Act (Sept. 1969) 9 Cal. Law Revision Com. Rep. (1969) pp. 811-815 (1969 Law Revision Commission Report).) The report explicitly discussed the *Jacobsen* decision (at p. 811), and stated that "[t]he holding in the *Jacobsen* case has been partially overcome by a special statutory procedure, provided in 1959 by enactment of Section 1242.5 of the Code of Civil Procedure. Section 1242.5 is limited to public entities that have the power to condemn land 'for reservoir purposes.' " (1969 Law Revision Com. Rep. at pp. 811-812; see also A Study Relating to Sovereign Immunity (Jan., 1963) 5 Cal. Law Revision Com. Rep. 11, 110, fn. 5 (1963 Van Alstyne Study) ["In the case of surveys and tests to determine the suitability of lands for reservoir purposes, the restrictive influence of the *Jacobsen* case . . . has been eliminated by a special statutory procedure established in Cal. Code Civ. Proc. § 1242.5, enacted in 1959."])[10]

The 1969 Law Revision Commission report observed that, like investigations necessary to determine the suitability of potential reservoir sites, the necessary precondemnation exploration of potential sites for other public projects in addition to reservoirs may also "involve activities that present the likelihood of compensable damage, *including the digging of excavations, drilling of test holes or borings, cutting of trees, clearing of land areas, moving of earth, use of*

---

[10] The 1963 study was authored by Professor Arlo Van Alstyne and represented the views of Professor Van Alstyne and not necessarily those of the Law Revision Commission. (1963 Van Alstyne Study, *supra*, 5 Cal. Law. Revision Com. Rep. at p. 5, fn. *.)

*explosives, or employment of vehicles or mechanized equipment.*"  (1969 Law

Revision Com. Rep., 9 Cal. Law Revision Com. Rep*., supra*, at p. 814, italics

added.)  Noting that "[r]epresentatives of local public entities have suggested that

the deposit-and-court-order system provided by Section 1242.5 be extended to all

types of condemnors without limitation as to the purpose of the contemplated

acquisition," the report ultimately recommended that "Section 1242.5 should be

expanded to cover entries for any purpose for which land may be acquired by

condemnation." (*Ibid.*)  Furthermore, the report also recommended, as a clarifying

companion measure, the addition of a new provision (Gov. Code, § 816) to the

California Tort Claims Act, "providing that, in connection with any entry upon

private property to conduct surveys, explorations, or similar activities, a public

entity is liable for 'actual damage' to property or for 'substantial interference' with

the owner's use or possession."  (1969 Law Revision Com. Rep., 9 Cal. Law

Revision Com. Rep., *supra*, at p. 815.)

The following year, the Legislature amended section 1242.5 and added a

new section 816 to the Government Code, as recommended in the 1969 Law

Revision Commission report.  As amended in 1970, section 1242.5 applied to all

entities having the power of eminent domain and required all such entities, in the

absence of the property owner's consent, to obtain a court order and deposit an

amount to compensate the landowner for any resulting damage before entering and

undertaking any activities that would result in any actual damage or substantial

interference with the owner's possession or use of the property.  As amended,

section 1242.5 applied to all entries and activities specified in section 1242 as

amended in the same bill (former § 1245.5, subd.(a), as amended by Stats. 1970,

ch. 662, § 3, p. 1289), and thus specifically applied to entries "to make studies,

surveys, examinations, tests, soundings, or appraisals or to engage in similar

activities reasonably related to the purpose for which the power may be

exercised." (Former § 1242, subd. (b), as amended by Stats 1970, ch. 662, § 2, p. 1288.) The newly enacted section 816 of the Government Code explicitly provided that, notwithstanding the general provision of the Tort Claims Act affording immunity to a public employee arising out of an entry upon property when the entry is expressly or impliedly authorized by law (Gov. Code, § 821.8), a public entity is liable for actual damage to property or for a substantial interference with the possession or use of property when such damage or interference arises from an entry pursuant to sections 1242 or 1242.5 of the Code of Civil Procedure to engage in the activities embodied in those sections. (Gov. Code § 816, added by Stats. 1970, ch. 1099, § 3, p. 1957.)

In 1975, as the culmination of a multiyear effort to update and reorganize California's eminent domain statutes into a comprehensive statutory scheme, the Legislature enacted a new, lengthy, and detailed Eminent Domain Law. (Stats. 1975, ch. 1275, §§ 1-5, pp. 3409-3466.) The new Eminent Domain Law moved and revised the then-existing precondemnation entry and testing provisions of former sections 1242 and 1242.5 into a new, separate article of the Eminent Domain Law (ch. 4, art. 1), containing the current precondemnation entry and testing statutes — sections 1245.010 to 1245.060 — that we have set forth above. (*Ante*, pp. 15-18.)

Although the legislative history of the 1959 and 1970 versions of former sections 1242 and 1242.5 makes it quite clear that those statutes were intended to encompass drilling or boring along with the other activities typically required to determine the suitability of property as a potential site for a contemplated reservoir or other public project (see *ante*, pp. 24-28), the prior statutes did not explicitly include "drillings" or "borings" as one of the activities specifically listed in the statute. As enacted in 1975, the current applicable statute specifically includes "borings" as one of the listed categories of activities to which the

28

precondemnation entry and testing statutes apply.  (§ 1245.010 [authorizing entry "to make photographs, studies, surveys, examinations, tests, soundings, borings, samplings, or appraisals or to engage in similar activities reasonably related to acquisition or use of the property"].)  In this regard, the 1975 California legislation closely tracks the comparable provision of the Uniform Law Commissioners' Model Eminent Domain Code, a model code that had been adopted by the National Conference of Commissioners on Uniform State Laws a year earlier in 1974.  (13 pt. 1 West's U. Law Ann. (2002) U. Eminent Domain Code, § 301, subd. (a) ["A condemnor . . . may enter upon real property and make surveys, examinations, photographs, tests, soundings, borings, and samplings, or engage in other activities for the purpose of appraising the property or determining whether it is suitable and within the power of the condemnor to take for public use . . . ."].)

In sum, the language of the current precondemnation entry and testing statutes does not limit the listed activities to activities that are only innocuous or superficial.  The legislative history of the current statutes demonstrates a legislative intent to create a procedure under which a public entity that is considering acquisition of property for a public project can conduct the type of extensive investigatory testing and exploration that the *Jacobsen* decision concluded was not permitted under the entry statute in effect at that time.  For these reasons, we conclude that the current precondemnation entry and testing statutes are properly interpreted to encompass the type and degree of precondemnation environmental and geological testing at issue here.  Accordingly, we reject the landowners' claim that the Department overreached in invoking the

29

precondemnation entry and testing statutes in order to obtain authority to conduct the precondemnation activities proposed in this case.[11]

Having concluded that the precondemnation statutes were intended to and do apply to these proposed activities, we turn to the constitutional question.

## IV. Did the Court of Appeal correctly conclude that an order issued pursuant to the precondemnation entry and testing statutes would violate the takings clause as applied to (1) the environmental activities authorized by the trial court and (2) the geological activities proposed by the Department?

Both the United States Constitution and the California Constitution provide that when a public entity takes private property for a public use just compensation must be paid to the property owner. (U.S. Const., 5th amend. [federal takings clause]; Cal. Const., art. I, § 19, subd. (a) [state takings clause].)[12] The United

---

[11] Contrary to the landowners' assertion, the Court of Appeal opinion in *County of San Luis Obispo v. Ranchita Cattle Co.* (1971) 16 Cal.App.3d 383 (*Ranchita*) did not hold that "entry upon private lands permitted by the Entry Statute cannot amount to anything other than such innocuous entry and superficial examination as would suffice for making surveys and maps." In *Ranchita*, the public entity and landowner entered into an access agreement permitting entry, but the agreement failed to specify the scope of the activities permitted upon entry. Absent such specification, the court held that *the access agreement* gave the entity "no more than a right to make an innocuous entry and superficial examination sufficient for the making of surveys and maps." (*Id*. at p. 389.) The *Ranchita* court did *not* hold or suggest that when a public entity obtains a court order pursuant to the entry statute, a court may authorize only superficial examination or testing.

[12] California and federal authorities establish that eminent domain — the authority "to take privately owned property . . . and convert it to public use" (Black's Law Dict. (10th ed. 2014) p. 637) — is "an inherent attribute of sovereignty" and that the takings clauses impose constitutional limitations upon the exercise of that inherent sovereign power. (*People v. Chevalier* (1959) 52 Cal.2d 299, 304; see, e.g., *United States v. Carmack* (1946) 329 U.S. 230, 241; *Georgia v. Chattanooga* (1924) 264 U.S. 472, 480.); *County of San Mateo v. Coburn* (1900) 130 Cal. 631, 634.

States Supreme Court has long held that the federal takings clause applies to the states through the Fourteenth Amendment. (*Chicago, B. & Q.R. Co. v. Chicago* (1897) 166 U.S. 226, 239.)

### A. Federal Takings Clause

The federal takings clause, as embodied in the Fifth Amendment of the United States Constitution, provides simply and concisely: "nor shall private property be taken for public use without just compensation."

In general, the United States Supreme Court has interpreted the federal takings clause to require a state to establish a procedure through which a property owner, whose property has been taken, can recover just compensation after a taking has occurred. The federal takings clause has not been construed to require a state to adopt any particular type of eminent domain procedure or to compel a public entity either to initiate an eminent domain proceeding or to pay just compensation *before* engaging in conduct that results in a taking of property within the meaning of the federal takings clause.

In *Williamson Planning Comm'n v. Hamilton Bank* (1985) 473 U.S. 172, 194-195 (*Williamson*), the high court explained in this regard: "The Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation. [Citation.] Nor does the Fifth Amendment require that just compensation be paid in advance of, or contemporaneously with, the taking; all that is required is that a ' "reasonable, certain and adequate provision for obtaining compensation" ' exist at the time of the taking. [Citations.] If the government has provided an adequate process for obtaining compensation, and if resort to that process 'yield[s] just compensation,' then the property owner 'has no claim against the Government' for a taking."

Furthermore, although the high court has made clear that just compensation under the federal takings clause is to be determined by what the property owner

31

has lost, *not* by what the public entity has gained (see, e.g., *Brown v. Legal Foundation of Wash.* (2003) 538 U.S. 216, 235-236 ["[T]he 'just compensation' required by the Fifth Amendment is measured by the property owner's loss rather than the government's gain"]), the governing decisions make clear that there is no single formula or standard for ascertaining an amount that constitutes just compensation. As the high court stated in *United States v. Virginia Electric Co.* (1961) 365 U.S. 624, 633: "The guiding principle of just compensation is reimbursement to the owner for the property interest taken. 'He is entitled to be put in as good a position pecuniarily as if his property had not been taken. He must be made whole but is not entitled to more.' [Citation.] [Citations.] In many cases this principle can readily be served by the ascertainment of fair market value — 'what a willing buyer would pay in cash to a willing seller.' [Citation.] But this is not an absolute standard nor an exclusive method of valuation." (See, e.g., *United States v. Commodities Corp.* (1950) 339 U.S. 121, 123 ["This Court has never attempted to prescribe a rigid rule for determining what is 'just compensation' under all circumstances and in all cases. Fair market value has normally been accepted as a just standard. But when market value has been too difficult to find, or when its application would result in manifest injustice to owner or public, courts have fashioned and applied other standards." (fn. omitted)]; *United States v. Toronto Nav. Co.* (1949) 338 U.S. 396, 402 ["Perhaps no warning has been more repeated than that the determination of value cannot be reduced to inexorable rules."].)

As we have seen, the current precondemnation entry and testing statutes not only establish a statutory compensation procedure but also expressly preserve a property owner's right to pursue and obtain damages in a statutorily authorized civil action or an ordinary inverse condemnation action. (§ 1245.060, subds. (a), (c), (d).) Taken as a whole, state law clearly provides " ' "a reasonable, certain,

and adequate" ' " procedure (*Williamson*, *supra*, 473 U.S. at p. 194) to enable a property owner to recover money damages for any injury caused by the activities authorized by the statutes.  In their briefing, the landowners do not address the prerequisites to a federal takings claim, set forth in the *Williamson* decision (see 473 U.S. at pp. 196-197 [holding federal takings claim premature where property owner had not pursued available state inverse condemnation action]).  Nor do they cite any decision that holds that the damages authorized by the precondemnation entry and testing statutes and California's inverse condemnation principles are, on their face, inadequate to constitute just compensation under the federal takings clause for the type of precondemnation entry and testing activities authorized by the statutes.  (Cf., *post*, pp. 57-63 [explaining that damages authorized by the precondemnation entry and testing statutes constitute just compensation for purposes of state takings clause].)  Furthermore, because the landowners have mounted this challenge before the Department has undertaken any activities and before any determination has been made as to the damages to which the landowners are entitled under the relevant statute and California inverse condemnation principles, it cannot be determined at this point that the available California procedures have not " 'yield[ed] just compensation.' " (*Williamson*, *supra*, 473 U.S. at p. 195.)  Accordingly, the landowners' current constitutional challenge cannot rest on the federal takings clause.[13]

---

[13]     In a footnote, the Court of Appeal acknowledged that in light of the United States Supreme Court opinion in *Williamson*, the landowners' challenge was not supported by the federal takings clause, and that the merits of the challenge rested solely on the requirements of the California takings clause.

**B. California Takings Clause**

The takings clause of the California Constitution, currently embodied in article I, section 19, subdivision (a), provides: "Private property may be taken or damaged for a public use and only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner. The Legislature may provide for possession by the condemnor following commencement of eminent domain proceedings upon deposit in court and prompt release to the owner of money determined by the court to be the probable amount of just compensation."[14]

On its face, the California takings clause differs from the federal takings clause in a number of respects. First, whereas the federal takings clause applies only to the taking of property for public use without just compensation, the state takings clause requires just compensation to be paid for the "tak[ing] or damag[ing]" of property for a public use. (Cal. Const. art. 1, § 19, subd. (a).) Second, unlike the federal takings clause, the state takings clause affords a property owner the right to have just compensation "ascertained by a jury unless waived." (*Ibid*.) Third, in contrast to the federal takings clause, the state takings clause provides in its first sentence that private property may be taken or damaged for public use "only when just compensation, ascertained by a jury unless waived, has *first* been paid to, or into court for, the owner." (*Ibid*., italics added.) The second sentence of the state takings clause, however, qualifies this third

---

**14** Article I, section 19 of the California Constitution was amended by an initiative measure in June 2008 to place limits on a public entity's acquisition by eminent domain of "an owner-occupied residence for the purpose of conveying [the property] to a private person." (Cal. Const. art. I, § 19, subd. (b); see *id.*, art. I, § 19, subds. (c)-(e).) Those provisions are not at issue in this case.

requirement that a jury determination of the amount of compensation that is due and payment of that amount to the owner *precede* any taking or damaging of property, declaring that "[t]he Legislature may provide for possession by the condemnor following commencement of eminent domain proceedings upon deposit in court and prompt release to the owner of money determined by the court to be the probable amount of just compensation." (*Ibid.*) As we shall see, this second sentence of the state takings clause has particular significance for the issues presented by this case.

As a general matter, a classic condemnation action is ordinarily required when a public entity has made the determination to acquire legal title to or exclusive possession of property for use in the construction of a public project. Given the nature and severity of the property owner's loss in that classic taking context, the quite elaborate and lengthy process established by the Eminent Domain Law and related statutes for classic condemnation actions — involving appraisal and negotiation, the official adoption of a resolution of necessity after notice and hearing, the formal commencement of a proceeding by a complaint and answer, discovery and exchange of valuation data, a bifurcated trial on objections to the right to take and on the issue of compensation, and a jury determination of compensation — is understandable. (See §§ 1245.210 to 1263.530; Gov. Code, §§ 7267 to 7267.7.)

The second sentence of article I, section 19, subdivision (a) of the California Constitution — explicitly authorizing the Legislature to permit a condemnor to obtain possession of property prior to a jury's ascertainment of just compensation by depositing in court the probable amount of just compensation — was adopted primarily to give the Legislature broad authority to enact a so-called quick take statutory procedure that fairly protects the interests of both public entities and property owners. (See Voter Information Guide, Gen. Elec. (Nov. 5,

35

1974) analysis of Prop. 7 by Leg. Analyst, p. 26; Recommendation:  Taking
Possession and Passage of Title in Eminent Domain Proceedings (Oct. 1960) 3
Cal. Law Rev. Com. Rep. (1961) pp. B-10 to B-11.)  Through the current statutory
quick take procedure (§ 1255.010 et seq.), a public entity that has already
determined that it intends to acquire a specific property for public use may, after
taking the steps necessary to commence a classic condemnation action, obtain
exclusive possession of the property and begin construction of the project before
the typically lengthy classic condemnation action has fully run its course and a
jury determination of just compensation has been made.  (See *Mt. San Jacinto
Community College Dist. v. Superior Court* (2007) 40 Cal.4th 648, 657-658 (*Mt.
San Jacinto*).)

However, the state takings clause does not always require the
commencement of a classic condemnation action when private property is taken or
damaged for public use within the meaning of that clause.  Most typically, for
example, although damage to property adjacent to a public improvement caused
by the construction or operation of the improvement constitutes a compensable
taking or damaging of property for purposes of the state takings clause, a public
entity is not considered to have violated the state takings clause simply because
the public entity has not commenced a classic condemnation action or paid or
deposited in court just compensation as ascertained by a jury *before* inflicting such
damage.  Instead, under such circumstances, the California takings clause has been
interpreted to afford the property owner a right to maintain an action for
damages — an inverse condemnation action — *after* the damage has been
incurred.  (See, e.g., *Reardon v. City & County of San Francisco* (1885) 66 Cal.
492 [foundation of building on property adjacent to roadway project damaged by
subsidence of supporting land during construction of the roadway]; *Albers v.
County of Los Angeles* (1965) 62 Cal.2d 250 [damage to adjacent property from

36

landslide resulting from landfill deposited in construction of a public improvement]; *Belair v. Riverside County Flood Control Dist.* (1988) 47 Cal.3d 550 [damage to adjacent property when flood control levee failed and adjacent property was flooded].)

As this court observed in *People v. Ricciardi* (1943) 23 Cal.2d 390, 400: "When compensation is claimed either for a taking or a damaging the issues may be presented for adjudication in at least two forms of action. In one there is an absence of a proceeding in eminent domain. In that form of action the property owner seeks relief by bringing an action for compensation for a taking or a damaging of his property or both, as the case may be. . . . [¶] The other form of action is, as here, a proceeding in eminent domain . . . ." Similarly, in *Heimann v. City of Los Angeles* (1947) 30 Cal.2d 746, 753, the court explained: "Here the proceeding is not one brought by a condemnor, but is an action wherein the owners seek compensation under article I, section 14 of the Constitution for the taking and damaging of their properties for a public use without just compensation having first been made or paid into court. In both forms of action the result is the same in that in each the property owner receives compensation for the invasion of his property rights; only the procedure in arriving at the result is different . . . ." And in *People v. Ayon* (1960) 54 Cal.2d 217, 229, where a property owner sought to obtain recovery for damage that the property owner maintained would result from a project as proposed, the court further explained: "But such damages cannot be recovered until they have occurred. They may never occur. . . . [¶] . . . [¶] When the condemnation action is tried before the improvement is constructed, and substantial although temporary interference with the property owner's right of possession or access occurs during construction, the property owner may maintain a *subsequent* action for such damage occurring during construction." (Italics added; see *Eachus v. Los Angeles etc. Ry. Co.* (1894) 103 Cal. 614, 621-622.)

37

The statutes at issue in the present case involve a factual setting — precondemnation entry and testing — that falls between the classic condemnation proceeding where the public entity is seeking to obtain title to or a compensable property interest in the property and the typical inverse condemnation action where the public entity does not intend to enter or intrude upon private property but damage to such property nonetheless ensues. Here, the proposed precondemnation entry and testing activities upon the subject property are intentional, but the public entity is not seeking to obtain title to or exclusive possession of the property for a significant period of time. Rather, the public entity is seeking temporary access to the property to conduct investigations that are needed to decide whether the property is suitable for a proposed project and should thereafter be acquired by the public entity. Furthermore, as in the inverse condemnation context, the public entity is not acting for the purpose of taking or damaging the private property at issue, and any loss suffered by the property owner is often an unavoidable consequence of the public entity's necessary exploratory activities. In this precondemnation setting, the Legislature determined — in response to *Jacobsen*, *supra*, 192 Cal. 319 — that a procedure less elaborate than that embodied in a classic condemnation action is constitutionally adequate and appropriate. We proceed to analyze the constitutional validity of the current precondemnation entry and testing statutes.

In evaluating the validity of the statutory scheme the Legislature created to respond to *Jacobsen*, *supra*, 192 Cal. 319 — the court order and deposit procedure embodied in the current precondemnation entry and testing statutes — it is useful to understand the general common law background relating to the entry of public officials onto private property to conduct lawfully authorized activities. At common law, when a public official was required or authorized by statute to perform a public duty or activity, the statutory authority was generally recognized

38

as carrying with it *a legal privilege* to enter private property for the purpose of performing or exercising such duty or authority that absolved the government of liability for what would otherwise be considered a trespass. (See Rest.2d Torts, § 211 & com. (c), pp. 398-401; 1 Harper et al. on Torts (2d ed. 1986) § 1.20, pp. 64-68.)[15] In enacting the California Tort Claims Act in 1963, the Legislature essentially codified this general common law privilege in declaring that public employees are not liable "for an injury arising out of [the] entry upon any property where such entry is expressly or impliedly authorized by law." (Gov. Code, § 821.8; see *id.*, § 815.2 [public entity liable only to extent public employee liable].)[16]

Outside the precondemnation entry and testing context, numerous statutes grant public entities and employees the authority to enter and to engage in official activities on private property for a very wide range of purposes. Common

---

[15] Section 211 of the Restatement Second of Torts reads in full: "A duty or authority imposed or created by legislative enactment carries with it the privilege to enter land in the possession of another for the purpose of performing or exercising such duty or authority in so far as the entry is reasonably necessary to such performance or exercise, if, but only if, all the requirements of the enactment are fulfilled."

Comment (c) to section 211, in turn, states in relevant part: "The legislative duty or authority carries with it a privilege to enter land in the possession of another if it is reasonably necessary to do so in order to perform the duty or exercise the authority. The privilege of entry for the purpose of performance or exercise of such duty or authority may be specifically given, *as where an employee of a public utility is in terms authorized to enter upon privately owned land for the purpose of making surveys preliminary to instituting a proceeding for taking by eminent domain.*" (Rest. 2d. Torts, § 211, com. (c), p. 399, italics added.)

[16] At the same time, Government Code section 821.8 recognizes that there may be liability for injuries to the property caused by negligence or a wrongful act or omission.

examples include entries to execute search warrants, to conduct health and safety inspections, to enforce fish and game regulations, to carry out workplace inspections, and to investigate and eliminate nuisances. (See generally 1963 Van Alstyne Study, 5 Cal. Law Revision Com. Rep. *supra*, 11, 110-119.) As a general matter, in the absence of any connection with the construction or operation of a public improvement, conducting such entries and activities on private property, even when such activities result in damage to the property, has not been considered to constitute either the taking of a compensable property interest in property or the damaging of property so as to entitle the property owner to just compensation under the state takings clause. (See, e.g., *Customer Co. v. City of Sacramento* (1995) 10 Cal.4th 368, 378 ["Neither the 'taken' nor the 'or damaged' language [of California Constitution article I, section 19] ever has been extended to apply outside the realm of eminent domain or public works to impose a Constitution-based liability, *unamenable to legislative regulation*, for property damage incidentally caused by the actions of public employees in the pursuit of their public duties."]; *Onick v. Long* (1957) 154 Cal.App.2d 381, 387 [no liability for entry by alcohol beverage control agents to enforce liquor laws].) Instead, any potential recovery by a property owner against a public entity outside the public improvement context has been based on tort principles. (See, e.g., *Customer Co. v. City of Sacramento*, *supra*, at p. 378.)

As *Jacobsen, supra*, 192 Cal. 319, demonstrates, however, some precondemnation entry and testing activities — when they involve operations that will result in actual injury to, or substantial interference with the possession and use of, the entered property — have been viewed as triggering the protections of the California takings clause. (*Id*. at pp. 324-328; see *Heimann v. City of Los Angeles*, *supra*, 30 Cal.2d at pp. 755-756.) The relevant precondemnation entry and testing provisions of the Eminent Domain Law at issue here — provisions

that, as we have explained, were adopted by the Legislature in recognition of and in response to the *Jacobsen* decision — implicitly recognize that a public entity's precondemnation entry on private property and its conducting of examinations, surveys, borings, and similar related activities on such property will at times fall into the category of activities that constitute a taking or damaging of property under the California takings clause.

In recognition of the interests of the property owner protected by the state takings clause as well as the interest and need of public entities in conducting precondemnation investigation and testing, the current precondemnation entry and testing statutes establish a special, compact, and expedited procedure with which public entities must comply before intentionally entering private property and engaging in precondemnation activities that may damage or significantly interfere with the property owner's possession or use of the property. The statutes require the public entity either to obtain the consent of the property owner or to seek and obtain a court order that specifically authorizes the particular activities that the public entity may conduct on the property and requires the public entity to deposit an appropriate sum equal to the amount of probable compensation to which the property owner is entitled. The statutes further give the property owner access to the deposited funds by establishing what the property owner has lost as a result of the public entity's activities.

It is well established, of course, that as a general rule statutes are presumed to be constitutional. (See, e.g., *Calfarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805, 814.) And, as past decisions of this court have held, when the Legislature has enacted a statute with constitutional constraints in mind "[t]here is a 'strong presumption in favor of the Legislature's interpretation of a provision of the

41

Constitution.' " (*Mt. San Jacinto*, *supra*, 40 Cal.4th at p. 656;[17] *Rooney v. Vermont Investment Corp.* (1973) 10 Cal.3d 351, 365-366; *Methodist Hosp. of Sacramento v. Saylor* (1971) 5 Cal.3d 685, 691-696.) As this court explained in *Pacific Legal Foundation v. Brown* (1981) 29 Cal.3d 168, 180: "[O]ur past cases establish that the presumption of constitutionality accorded to legislative acts is particularly appropriate when the Legislature has enacted a statute with the relevant constitutional prescriptions clearly in mind. [Citation.] In such a case, the statute represents a considered legislative judgment as to the appropriate reach of the constitutional provision. Although the ultimate constitutional interpretation must rest, of course, with the judiciary (see *Marbury v. Madison* (1803) 5 U.S. (1 Cranch) 137, 176-180), a focused legislative judgment on the question enjoys significant weight and deference by the courts."

Here, the Legislature enacted the statutory provisions at issue (and their immediate predecessors) with full knowledge and in light of this court's decision in *Jacobsen*, and on the recommendation of the California Law Revision Commission and Professor Van Alstyne, a leading academic authority on eminent domain. (See 1969 Law Revision Com. Rep., 9 Cal. Law Revision Com. Rep., *supra*, at pp. 814-815; *Unintended Physical Damage*, *supra*, 20 Hast. L.J. at

---

[17] The *Mt. San Jacinto* decision clearly refutes the Court of Appeal's suggestion that the general presumption of constitutional validity does not apply to an eminent domain statute. In *Mt. San Jacinto*, this court applied the presumption of constitutional validity in determining the constitutionality of a number of challenged provisions of the quick take statute. The decision relied upon by the Court of Appeal stands for the proposition that public entities that wish to exercise the power of eminent domain must strictly comply with the requirements imposed by the applicable eminent domain statutes. (See *Burbank-Glendale-Pasadena Airport Authority v. Hensler* (2000) 83 Cal.App.4th 556, 562.) Here, the Department has complied with the procedural requirements set forth in the precondemnation entry and testing statutes.

pp. 509-511.)  Further, as we have noted, both the Law Revision Commission and Professor Van Alstyne expressed the view that the court order and deposit procedure embodied in the post-*Jacobsen* statutes remedied the constitutional defects in the entry statute that was in effect at the time of the *Jacobsen* decision. (1969 Law Revision Com. Rep., 9 Cal. Law Revision Com. Rep., *supra*, at pp. 811-812; *Unintended Physical Damage*, *supra*, 20 Hast. L.J. at p. 485.)

In this case, the Department acknowledged from the outset that its entry and proposed exploration activities were subject to the provisions of the precondemnation entry and testing statutes and that it was required under those provisions either to obtain the consent of each property owner or to comply with the procedure set forth in the statutes.  (§ 1245.020.)  Accordingly, we have no occasion in this case to decide what types of precondemnation entries and testing are so minimal or innocuous that they do not trigger the statutory requirements imposed by the precondemnation statutes.

As noted, with regard to the *environmental* activities, the trial court concluded that the applicable statutory procedures established by the precondemnation entry and testing statutes were sufficient to comply with the federal and state takings clauses.  The trial court issued an order authorizing the Department to undertake specified environmental activities subject to a variety of detailed conditions imposed by the court.  At the same time, with regard to the proposed *geological* activities, the trial court concluded that, in light of the *Jacobsen* decision, the precondemnation entry and testing statutes should not be interpreted to encompass such activities and that, in any event, the current statutory procedures are not sufficient to comply with the California takings clause.  Accordingly, the trial court rejected the Department's request for an order authorizing it to undertake such activities.

43

The majority in the Court of Appeal affirmed the trial court's denial of an order permitting the proposed geological activities, but it reversed the trial court's order authorizing the environmental activities. The Court of Appeal concluded that given the breadth and duration of the environmental activities authorized by the trial court, the procedure established by the precondemnation entry and testing statutes was insufficient to satisfy the demands of the California takings clause.

The Department contends that the Court of Appeal erred with respect to both the proposed geological activities and the environmental activities authorized by the trial court. Among other contentions, the Department maintains that the procedure embodied in the precondemnation entry and testing statutes satisfy the constitutional requirements of the California takings clause as applied to both the authorized environmental activities and the proposed geological activities.

We turn first to the validity of the precondemnation entry and testing statutes as applied to the environmental activities authorized by the trial court.

### 1. Environmental Testing Activities

As noted, the trial court expressly found that the precondemnation environmental testing activities at issue were reasonably related to the Department's investigation of its potential eminent domain acquisitions. In fashioning its order the court stated it had "determined the nature and scope of the activities reasonably necessary to accomplish the purposes identified, taking due consideration of the constitutional limitations and statutory procedures required for a taking of property. The court has provided suitable limitations to strike the best possible balance between the needs of [the Department] and the interests of the property owners."

The Court of Appeal did not suggest that the authorized environmental activities were not reasonably necessary for the Department to conduct, nor that the scope of the activities permitted by the trial court exceeded the degree

44

reasonably required to obtain the relevant information.  Nonetheless, the Court of Appeal held that the trial court's environmental order was impermissible, relying on two grounds on which it concluded the precondemnation entry and testing statutes violate the state takings clause as applied to the environmental activities authorized by the trial court order.  First, the Court of Appeal concluded that the environmental order violated the state takings clause because the order authorized the taking of a compensable property interest in the subject properties — what the Court of Appeal characterized as a "blanket temporary easement" — without the commencement of a classic condemnation proceeding in which the measure of damages provided to the property owner would be based on the value of the temporary easement rather than on the damages authorized by the precondemnation entry and testing statutes.  Second, the Court of Appeal concluded that the environmental order additionally violated the state takings clause because the precondemnation entry and testing statutes fail to provide a property owner with a right to a jury trial on the amount of compensation to which the owner is entitled.

     We discuss each of these asserted flaws in turn.

> **(a) Does the environmental order violate the takings clause by (i) taking a compensable property interest, (ii) without the commencement of a classic condemnation action (iii) in which the property owner is afforded an adequate measure of just compensation?**

### (i) Compensable property interest?

     The Court of Appeal concluded that in light of the number of days the trial court order permitted the Department's employees to enter and conduct the specified environmental activities on the landowners' property — from 25 to 66 days over a one-year period, depending upon the size of the property — and the

fact that the order permitted the Department to conduct the environmental activities throughout the properties, the order granted the Department a blanket temporary easement that constituted a compensable property interest for purposes of the state takings clause. The Court of Appeal held that such an interest could be obtained under the state takings clause only through a classic condemnation action in which just compensation would be measured by the value of such a temporary easement rather than by recovery for any damage to the property and substantial interference with possession and use of the property resulting from the environmental testing activities.

The Department takes issue with the Court of Appeal's characterization of the order as granting the Department a blanket temporary easement or that the asserted easement constitutes a compensable property interest for purposes of the state takings clause. It is well established that an easement may constitute a compensable property interest for purposes of the takings clause. (See, e.g., *City of Los Angeles v. Ricards* (1973) 10 Cal.3d 385, 388-389 (*Ricards*) [inverse condemnation action for temporary destruction of property owner's easement over a bridge that afforded access to owner's property]; *Pacific Gas & Electric v. Hufford* (1957) 49 Cal.2d 545 [condemnation action to obtain an easement for the construction, operation, and maintenance of electrical transmission line]; see generally 1 Matteoni, Condemnation Practice in Cal. (3d ed. 2014) § 4.80, pp. 4-130 to 4-132.) It is questionable, however, whether the authority afforded by the trial court's environmental order can accurately be characterized as granting the Department a compensable property interest for purposes of the state takings clause. Although the total number of days Department employees are permitted to enter and conduct investigatory activities on a landowner's property is not insignificant, the activities encompassed in the trial court's environmental order consist primarily of surveying and sampling activities that have been limited by

46

the trial court so as to minimize any interference with the landowner's use of the property. The landowner will retain full possession of the property and no significant damage to the property is intended or anticipated. The landowners have not cited any decision in which the granting of comparable authority to a public entity has been held to constitute a taking or damaging of a compensable property interest for purposes of the state takings clause.[18]

Nonetheless, in our view there is no need to definitely decide whether the nature and scope of the environmental activities authorized by the trial court should properly be characterized as granting the Department a compensable temporary easement for purposes of the California takings clause or at what point a compensable property interest might arise. Assuming, without deciding, that the trial court's environmental order can properly be characterized as granting the Department a compensable temporary easement for purposes of the state takings clause, we conclude that the procedure with which a public entity must comply under the precondemnation entry and testing statutes satisfies the requirements of the state takings clause so long as it is reformed to provide a property owner the

---

[18]    In advancing the argument that the environmental order amounts to the taking of a temporary easement, the landowners point to statements in a number of opinions to the effect that " 'the right to exclude [others is] "one of the most essential sticks in the bundle of rights that are commonly characterized as property." ' " (*Nollan v. California Coastal Comm'n.* (1987) 483 U.S. 825, 831.) As demonstrated by the common law rule recognizing that public officials generally enjoy a privilege to enter private property and to conduct statutorily authorized activities on such property (see, *ante*, pp. 37-38), however, the right to exclude others has never been viewed as an absolute or unqualified attribute of property ownership. Entries onto private property by public officials or employees to conduct statutorily authorized activities are a long recognized limitation of a property owner's right to exclude others.

option of obtaining a jury trial on the measure of damages (see discussion, *post*, at pp. 63-66.)

**(ii) Need for a classic condemnation action?**

To begin with, it is quite clear that the Eminent Domain Law itself does not contemplate that a classic condemnation action must be brought by a public entity that wishes to conduct the precondemnation testing activities encompassed by the precondemnation entry and testing statutes. In the Eminent Domain Law, the precondemnation entry and testing statutes (§§ 1245.010-1245.060) precede the provisions that set forth the procedure for commencing a classic condemnation action (§ 1250.110 et seq.). The relevant provisions of the Eminent Domain Law require a public entity, before commencing a classic condemnation action, to adopt a "resolution of necessity" that, among other matters, finds that the proposed project for which property is to be taken "is planned or located in the manner that will be most compatible with the greatest public good and the least private injury" and that "[t]he property described in the resolution is necessary for the proposed project." (§§ 1245.220, 1245.230, subd. (c)(2), (3).) The entire purpose of precondemnation entry and testing is to enable the public entity to determine whether or not the property is suitable and should be acquired for a public project and whether a classic condemnation action should be commenced. It is counterintuitive to maintain that the commencement of a classic condemnation action is required *before* such precondemnation activities may be undertaken. (See *Ranchita*, *supra*, 16 Cal.App.3d at p. 389 ["[I]f the statute is construed . . . to compel the public agency to first file an action in eminent domain to condemn the land as a condition precedent to the exercise of the rights conferred under sections 1242 and 1242.5 of the Code of Civil Procedure, and then abandon the action upon discovery, after survey, that the land was unsuitable, such construction would

48

require the agency to perform a useless act."]; Cal. Law Revision Com. com., 19 West's Ann. Code Civ. Proc. (2007 ed.) foll. § 1245.010, p. 406.)

In reaching its conclusion that a classic condemnation action is required to perform precondemnation activities that rise to the level of a taking or damaging of property, the Court of Appeal relied heavily on language in the *Jacobsen* decision stating that "[t]he only legal procedure provided by the constitution and statutes of this state for the taking of private property for a public use is that of a condemnation suit which the constitution expressly provides must *first* be brought before private property can be taken or damaged for a public use." (*Jacobsen*, *supra*, 192 Cal. at p. 331.) The current precondemnation entry and testing statutes, however, were not in existence at the time of *Jacobsen*. The only entry statute in existence at the time of *Jacobsen* did not require a public entity to obtain any type of judicial order before undertaking such precondemnation activities, and did not condition entry and the conducting of such activities upon the public entity's deposit of probable compensation for the proposed activities. Furthermore, that now defunct entry statute permitted the landowner to obtain damages after entry and examination only if the public entity acted negligently or in bad faith in undertaking such activities. It did not provide compensation for any actual damage to or substantial interference with the property owner's possession or use of the property that resulted from the public entity's entry and examination activities in the absence of negligence or bad faith.

As we have discussed, the Legislature enacted the current precondemnation entry and testing statutes to satisfy the constitutional flaw the *Jacobsen* decision found in the prior statute. (See, *ante*, pp. 24-29.) The current statutes authorize entry and testing that may result in actual damage or substantial interference with the property owner's possession or use of the property only if the public entity first obtains the consent of the property owner or complies with the protective

49

procedures set forth in the statute. The current statutes require a public entity (1) to seek and obtain a properly limited court order prior to undertaking such precondemnation activities, (2) to deposit into court, prior to any entry or testing, an amount that the court has determined is likely to cover any loss that the property owner sustains as a result of the authorized precondemnation activities, and (3) to pay damages to the property owner to compensate for any injury or substantial interference with possession or use that the owner incurs as a result of the precondemnation activities. These statutes were specifically intended to satisfy the obligations imposed by the state takings clause while at the same time affording both the public entity and the landowner an expedited legal procedure that the Legislature concluded was appropriate for the precondemnation context.

As we have explained, "[t]here is a 'strong presumption in favor of the Legislature's interpretation of a provision of the Constitution.' " (*Mt. San Jacinto*, *supra*, 40 Cal.4th at p. 656.) Contrary to the Court of Appeal's determination, we conclude that the state takings clause does not preclude the Legislature, in the precondemnation entry and testing context, from authorizing a public entity to proceed pursuant to an expedited precondemnation procedure rather than through a more elaborate classic condemnation proceeding.

As already observed (*ante*, pp. 36-37), the state takings clause has not been interpreted always to require the commencement of a classic condemnation proceeding before a public entity undertakes activity that may result in the taking or damaging of property for which just compensation must be paid. Most obviously, in the inverse condemnation context, a public entity has not been required to bring a condemnation action before undertaking activity that may possibly result in a taking or damaging of property. Instead, in that setting, the public entity satisfies its obligation under the takings clause by paying damages

50

that are awarded to the property owner in a subsequent inverse condemnation action.

A classic condemnation action is required when a public entity seeks to obtain legal title or a permanent property interest in private property; it has also been utilized when a public entity seeks to obtain exclusive possession of a portion of the property for a significant, albeit temporary, period of time (for example, through acquisition of a temporary construction easement).[19]  In the precondemnation entry and testing setting a public entity is not seeking to obtain legal title to a property interest or exclusive possession of any portion of the property for a significant period of time.  Instead, the public entity is seeking permission to enter the property and conduct specific activities for a limited period of time — activities that do not oust the property owner from its ownership or possession of the property even though they may potentially cause some property damage or interfere with the owner's possession and use of the property.

As Justice Blease in his dissenting opinion in the Court of Appeal observed, the procedure set forth in the current precondemnation entry and testing statutes closely tracks the procedure authorized by the second sentence of article I, section 19, subdivision (a) of the California Constitution.  To repeat, that sentence states: "The Legislature may provide for possession by the condemnor following

---

[19]    Unlike temporary construction easements that have been the subject of formal condemnation proceedings when a public entity needs to temporarily occupy a portion of adjacent property over a significant period of time for the storage of equipment during the construction of a project on other property (see, e.g., *City of Corona v. Liston Brick Co.* (2012) 208 Cal.App.4th 536, 539-540), the environmental order at issue here does not grant the Department exclusive possession of any portion of a landowner's property for a significant period of time.

51

commencement of eminent domain proceedings upon deposit in court and prompt release to the owner of money determined by the court to be the probable amount of just compensation." As already noted, this aspect of the takings provision was specifically intended to authorize legislative enactment of a so-called quick take procedure that is fair to both the property owner and the public entity. The quick take procedure enables a public entity that has already decided to acquire property by eminent domain to obtain possession of the property and to begin construction and operation of a public project quickly by depositing the probable amount of compensation into court for the protection of the property owner while the formal condemnation action proceeds. However, this second sentence of article I, section 19, subdivision (a) is not necessarily limited to the quick take context.

In the precondemnation entry and testing statutes, the Legislature relied on the procedural approach set forth in the second sentence of article I, section 19, subdivision (a) of the California Constitution, fashioning procedural protections for the respective interests of the property owner and the public entity in a manner that serves the fundamental purpose of the state takings clause in light of the special characteristics of the precondemnation setting. Unlike the circumstances that give rise to the quick take procedure, in which the public entity has already decided to condemn the property and the property interest that will be taken by a public entity is known and certain at the outset, in the precondemnation setting the public entity is still in the process of determining whether to condemn the property. In this setting, as the facts of the present case demonstrate, whether a public entity's proposed precondemnation activities will rise to the level of a compensable taking or damaging of property for purposes of the state takings clause, and, if so, the extent of the loss that will actually be sustained by a property owner for which compensation is due, cannot reliably be determined until the scope of the precondemnation activities that are authorized by the trial court is

52

known and the activities have actually been undertaken by the public entity. Even in those situations when it appears from the trial court's order that some damage to property will be unavoidable, the extent of the damage that will actually be incurred ordinarily would be speculative because the public entity, in carrying out the approved activities, may be able to minimize the damage sustained by the property owner and thus reduce the compensation that is due and the ultimate cost to the public. Furthermore, as already noted, the public entity's purpose in the precondemnation setting, as in the inverse condemnation context, is not to take or damage property, and any loss ultimately sustained by a property owner, however predictable, is generally an unavoidable consequence of reasonable and necessary precondemnation investigatory activity.

In view of the unquestioned need for precondemnation entry and testing in order to avoid the ill-advised and premature condemnation of private property and the substantial uncertainties inherent in the precondemnation testing context, the Legislature established a statutory scheme that takes into account the significant public and private interest in an expedited precondemnation procedure and at the same time extends to a property owner the fundamental procedural protections embodied in the second sentence of article I, section 19, subdivision (a) of the California Constitution whether or not a public entity's proposed precondemnation activities actually rise to the level of a taking or damaging of property for purposes of the state takings clause. First, the statutes require the public entity to institute a judicial proceeding under the Eminent Domain Law prior to undertaking any precondemnation entry or testing that poses a risk of damage or interference with

53

the property owner's possession or use of the property.  (§ 1245.020.)[20]  Second,

the statutes require the trial court to limit the public entity's authorized activities

─────────────────────

[20]     The landowners maintain that the judicial proceeding provided for in the precondemnation entry and testing statutes does not constitute an "eminent domain proceeding[]" within the meaning of the second sentence of article I, section 19, subdivision (a) of the California Constitution.  In support of this position, they point to other provisions of the Eminent Domain Law that use the term "eminent domain proceeding" to refer to a classic condemnation action that is commenced when a public entity seeks to acquire legal title to or exclusive possession of property for use in a public project.  (See § 1250.110 et seq.)  Those statutory provisions, however, do not purport to define the term "eminent domain proceedings" *as used in article I, section 19, subdivision (a) of the California Constitution*, and nothing in the takings clause or any other provision of the California Constitution limits the meaning of that term in such a fashion.  Because the precondemnation entry and testing proceeding is a judicial proceeding explicitly contained within and authorized by the Eminent Domain Law — comprehensive legislation that the California Law Revision Commission described as "intended to supply rules for eminent domain proceedings" (The Eminent Domain Law (Dec. 1975) 13 Cal. Law Revision Com. Rep. 1007, 1009, fn. 2) — we conclude the precondemnation proceeding is reasonably viewed as an eminent domain proceeding as that term is used in the second sentence of article I, section 19, subdivision (a) of the California Constitution.  Under the statutes at issue, precondemnation entry and testing follows commencement of the precondemnation proceeding.

The concurring opinion maintains that the term "eminent domain proceedings" in the second sentence of article I, section 19 must be read to refer only to a classic condemnation action.  But there is nothing to suggest that the second sentence of article I, section 19 was intended to require a classic condemnation action to be commenced before undertaking *precondemnation* entry and testing activities when a public entity has not yet decided whether or not to condemn or acquire the property.  The second sentence of article I, section 19 recognizes the Legislature's authority to permit a public entity to obtain *exclusive* possession of property (and begin work on a public project) before a jury determination and payment of compensation so long as the public entity deposits an amount equal to probable compensation before taking such possession.  Given that, it is reasonable to interpret the second sentence as likewise recognizing the Legislature's authority to permit a public entity to effect a lesser interference with the owner's possession and use of the property — under the precondemnation

*(footnote continued on next page)*

(or, in the terminology of the second sentence of Cal. Const., art. I, § 19, subd. (a), to limit the nature and extent of the public entity's authorized "possession" of the property) to those activities that are reasonably necessary to accomplish the public entity's investigatory purpose.  (§ 1245.030.)  Further, the statutes require the public entity, prior to undertaking such activities, to deposit into court for the benefit of the property owner an amount that the court determines, based on the circumstances of the particular case, is the probable amount of just compensation for the activities authorized by the court.  (*Ibid*.)[21]  Finally, the statutes provide a procedure through which a property owner can promptly obtain compensation from the deposit for any loss suffered as a result of the public entity's precondemnation activities, and, if those funds are insufficient, can obtain a judgment for the unpaid portion.  (§ 1245.060, subds. (a), (c).)

Accordingly, although the second sentence of article I, section 19, subdivision (a) of the California Constitution may not have been drafted with the precondemnation setting in mind, in fashioning the precondemnation entry and testing statutes the Legislature, acting under the authority granted by that sentence, has provided comparable protections to the property owner so as to satisfy the requirements of the state takings clause.

---

*(footnote continued from previous page)*

entry and testing statutes, which define a different type of eminent domain proceeding — so long as the same procedural protections apply.

[21]    In addition, in further recognition of the uncertain and dynamic nature of the investigatory process, the statutes explicitly authorize the trial court, at any time during the precondemnation process, to modify its initial order and to require the public entity to deposit additional funds if the court determines the initial deposit is inadequate.  (§ 1245.040.)

Thus, we conclude that the Legislature did not violate the state takings clause by authorizing a public entity to enter private property to conduct substantial precondemnation activities without the owner's consent or the commencement of a classic condemnation action so long as (1) the public entity obtains a court order specifying the activities that may be conducted on the property and first deposits in court an amount that the trial court determines is sufficient to cover the probable compensation to which the property owner may be entitled for losses sustained as a result of the entry and testing activities, and (2) the property owner is entitled to recover damages for any injury to the property and any substantial interference with its possession or use of the property resulting from the public entity's activities. Nothing in this court's decision in *Jacobsen*, *supra*, 192 Cal. 319, is contrary to this conclusion.[22]

We note that the overwhelming majority of judicial decisions in other states have upheld statutory provisions that authorize precondemnation entry and

---

[22] In concluding that a classic condemnation action is required, the Court of Appeal pointed in part to the provisions of Government Code section 7267.6. Government Code section 7267.6 provides: "If any interest in real property is to be acquired by exercise of the power of eminent domain, the public entity shall institute formal condemnation proceedings. No public entity shall intentionally make it necessary for an owner to institute legal proceedings to prove the fact of the taking of his real property." Unlike the statutes at issue here, Government Code section 7267.6 is not directed at precondemnation entry and testing activities, and that statute cannot reasonably be interpreted as intended to limit or displace the precondemnation entry and testing statutes. Instead, section 7267.6 is intended to apply after the public entity has conducted any precondemnation activities and has already decided to acquire real property. Further, under the precondemnation statutes a public entity is required to file a judicial proceeding to obtain authority to enter and conduct proposed testing; the statutes do not make it necessary for a property owner to institute legal proceedings to prove that its property has been taken.

preliminary surveys or examinations comparable to the activities authorized by the environmental order against a claim that the statute violates the takings clause of the applicable state constitution. (See, generally, Annot., Eminent Domain: Right to Enter Land for Preliminary Survey or Examination (1970) 29 A.L.R.3d 1104, 1111-1113, § 4, and later cases (2015 supp.) 158-159 ].) These decisions have concluded that property owners who are subjected to such precondemnation testing are adequately protected when they are permitted to recover for any damages they incur as a result of the entry and testing activities.[23] We also observe that the Uniform Eminent Domain Law, drafted by a nationwide body of eminent domain legal experts, contains provisions authorizing the same type of precondemnation entry and testing under procedures that closely parallel those in the applicable California statutes. (See 13 pt. 1 West's U. Laws Ann., *supra*, U. Eminent Domain Code §§ 301-305.)

### (iii) Adequate measure of damages?

Furthermore, contrary to the Court of Appeal's conclusion, we conclude that the statutory damages that a property owner is entitled to obtain under section 1245.060, the applicable precondemnation entry and testing statute, are a constitutionally adequate measure of just compensation under the state takings clause for the precondemnation activities authorized by the statutory scheme.

---

[23]    As we discuss below in connection with the geological testing issue, a number of out-of-state decisions have concluded that a public entity is required to condemn a temporary easement before undertaking significant precondemnation drilling or boring activities on private property. (*Post*, p. 72, fn. 33.) As we explain, none of the jurisdictions in question had adopted a precondemnation statutory scheme containing the substantial procedural protections embodied in the California precondemnation entry and testing statutes.

Like the concept of just compensation under the federal takings clause (*ante*, pp. 31-32), the just compensation required by the state takings clause is the amount required to compensate the property owner for what the owner has lost. (See, e.g., *Mt. San Jacinto*, *supra*, 40 Cal.4th at p. 666 [" ' "The just compensation required by the Constitution to be made to the owner is to be measured by the loss caused to him by the appropriation. He is entitled to receive the value of what he has been deprived of, and no more. To award him less would be unjust to him; to award him more would be unjust to the public." ' "]; *Citizens Utilities Co. v. Superior Court* (1963) 59 Cal.2d 805, 817.)

Although the measure of compensation that is "just" for purposes of both the federal and state takings clause is often determined by the "fair market value" of what has been lost, both federal and state takings cases uniformly recognize that the fair market value standard is not applicable in all circumstances and that there is no rigid or fixed standard that is appropriate in all settings. (See, e.g., *United States v. Virginia Electric Co.*, *supra*, 365 U.S. at p. 633; *Citizens Utilities Co. v. Superior Court, supra*, 59 Cal.2d at p. 817.) In other contexts, it is frequently possible to determine the fair market value of an easement by considering comparable sales or other evidence disclosing the price a willing buyer and willing seller would agree upon in relation to the value of the property as a whole prior to and after the taking or damaging of the easement in question. (See, e.g., *United States v. Virginia Electric Co., supra*, 265 U.S. at p. 630; *Pacific Gas & Elec. Co. v. Hufford, supra*, 49 Cal.2d at pp. 553-554; see generally 1 Matteoni, Condemnation Practice in Cal., *supra*, § 4.80, pp. 4-130; Clarke, *Easement and Partial Taking Valuation Problems* (1969) 20 Hast. L.J. 517.) However, the precondemnation entry and testing statutes authorize only temporary and limited types of activities — surveying and testing activities. Significantly, this limitation is further restricted by the individualized nature of each court order prescribing

specific limitations under which the authorized activities may be undertaken. Thus, even if we assume that in some circumstances a trial court order's entry and testing order can properly be characterized as the grant of a compensable temporary easement, there generally would not be a reliable and consistent means of establishing a fair market value for the particular easement at issue.[24] (Accord, § 1263.320, subd. (b) ["The fair market value of property taken for which there is no relevant, comparable market is its value on the date of valuation as determined by any method or valuation that is just and equitable"].)

In concluding that the damages authorized by the precondemnation entry and testing statutes would be inadequate for the activities authorized by the trial court's environmental order, the Court of Appeal suggested that, in addition to any damages that are recoverable under section 1245.060, a property owner is entitled to recover the rental value of the property for the period of time during which the activities authorized by that order are permitted. In light of the nature of the environmental order at issue here, however, granting a property owner the rental value of the property in addition to any damages the owner sustains for actual injury or substantial interference with the possession or use of the property would afford the owner an unwarranted windfall. Under the trial court's environmental order, the owner retains full possession and use of the property over the period covered by the order, notwithstanding the authorized testing activities. Under these circumstances, the rental value of the property would not be a valid measure of what the property owner has lost as a result of the trial court's environmental order. (Cf. e.g., *Otay Mesa Prop., L.P. v. United States* (Fed. Cir. 2012) 670 F.3d

---

[24] In this case, no evidence was presented indicating that the proposed temporary environmental or geological testing would reduce the fair market value of any property.

1358, 1368-1369 (*Otay Mesa*).)[25]  Accordingly, awarding such an amount to the property owner under these circumstances clearly would not be just to the public.[26]

---

[25]    In *Otay Mesa*, *supra*, 670 F.3d 1358, the United States Border Patrol had placed sensors on private property to aid in its apprehension of border crossing violations.  The sensors did not interfere with the property owner's use of the property and would be removed whenever the property owner notified the Border Patrol that it intended to develop the area on which a sensor was located.  In an inverse condemnation action brought by the property owner against the Border Patrol, the trial court, after finding that the Border Patrol's actions constituted the taking of a temporary easement, awarded the property owner just compensation based on the rental value of the property that had been charged in other instances for activities (skydiving and parachute training) that had precluded any use of the property by the property owner during the rental period.

On appeal, the Federal Circuit Court of Appeals held that the trial court had erred in using rental value as the basis for determining just compensation under the circumstances involved in that case.  The Federal Circuit explained:  "By exclusively applying a rental value methodology and looking to rents paid for the use of land for skydiving and parachute training, the [trial] court . . . overlooked exactly what has been taken by the Border Patrol — a minimally invasive permanent easement to use undeveloped land that is unilaterally terminable by Otay Mesa [the property owner].  Under the easement, each sensor must be located so as not to affect the functionality of the property.  In addition, should Otay Mesa wish to develop any portion of the property, any affected sensor will be removed or redeployed upon 30 days written notice . . . .  Finally, upon removal of a sensor, the portion of the easement relating to that sensor terminates.  In short, the court did not squarely address the just compensation appropriate to compensate Otay Mesa for the taking."  (*Otay Mesa*, *supra*, 670 F.3d at pp. 1368-1369.)

[26]    Under other circumstances — for example, when a precondemnation order grants a public entity *exclusive* possession of all or a portion of the property for a significant period of time — the rental value of the occupied property might well be an appropriate measure of the loss suffered by a property owner for substantial interference with its possession or use of the property and thus a proper measure of damages recoverable under section 1245.060.  (Cf. *Kimball Laundry Co. v. United States* (1949) 338 U.S. 1, 7.)

Instead, the compensation authorized by section 1245.060 — damages for any "actual damage" to the property and for "substantial interference with the [property owner's] possession or use of the property" — appears on its face to be a reasonable means of measuring what the property owner has lost by reason of the specific precondemnation activities that are authorized by the trial court's environmental order.  (Accord, e.g., *Sacramento & San Joaquin Drainage Dist. v. Goehring* (1970) 13 Cal.App.3d 58, 66-67 [affirming an award of $900 for the taking of a temporary easement for roadway purposes based on damage to the roadway]; *Ricards*, *supra*, 10 Cal.3d at pp. 388-390 [only nominal damages permitted when temporary taking of easement resulted in no loss].)[27]  Because this

---

[27]     In *Ricards*, *supra*, 10 Cal. 3d 385, the city's construction of a project upstream from the property owner's property caused a diversion of waters that destroyed a private bridge over which the downstream property owner held an easement that provided the sole access to her property.  Thereafter, the property owner brought an inverse condemnation action against the city, seeking just compensation for the temporary loss of the easement for the two years that elapsed before a public bridge was constructed to replace the old bridge.

In this court's decision in *Ricards*, we agreed with the trial court's conclusion that "the destruction of the bridge constituted a taking or damaging of the owner's property rights of access within the meaning of [the state takings clause for which] [] [s]he . . . became entitled to just compensation" (10 Cal.3d at p. 389), but we reversed the substantial monetary award that had been granted to the property owner by the trial court.  We explained:  "[T]he temporary impairment of access caused neither loss of use or rental value or permanent diminution in property value, nor financial disadvantage with respect to possible interim sale of the property.  The owner, therefore, suffered no injury that was not cured by the City's replacement of the bridge.  To afford her substantial compensation under such circumstances would place her in a better financial position than she would have been in had the bridge remained intact.  Therefore the judgment below must be reversed insofar as it awards the owner substantial damages for impairment of access."  (*Id.* at pp. 389-390.)  The court noted that on remand the trial court could award the property owner nominal damages.  (*Id.* at p. 390, fn. 4.)

61

matter is before us prior to any precondemnation activities having been conducted, we have no occasion in this case to determine exactly what specific items of actual damage or substantial interference with possession or use of the property are compensable under the statutes in question.[28] We observe, however, that because the statutory scheme must be interpreted so as to satisfy constitutional requirements, the provisions of section 1245.060 should be construed and applied in a manner that will permit a recovery by the affected property owner that fully complies with the just compensation required by the state takings clause. The numerous past California cases that have analyzed what damages are appropriately awarded for the taking or damaging of property in the inverse condemnation context may provide useful analogies in this regard. (See generally 8 Witkin, Summary of Cal. Law (10th ed. 2005) Constitutional Law, §§ 1145-1152, pp. 786-801 [listing cases].)[29]

---

[28] The landowners contend that the precondemnation entry and testing statutes preclude them from recovering any expense they may incur in having their own employees accompany or supervise the Department's employees during the survey and testing operations. But the landowners have not yet incurred such costs or sought to recover damages for such expenses through the procedure established by section 1245.060, subdivision (c), and thus we have no occasion to determine whether such expenses are recoverable under the statute. The landowners have not challenged the adequacy of the amount of probable compensation that the trial court's environmental order required the Department to deposit on the ground that such amount did not take into account such expenses.

[29] The Court of Appeal also suggested that the precondemnation entry and testing statutes were constitutionally deficient because the state takings clause precludes placing the burden on a property owner to establish that it has sustained a loss for which just compensation must be paid or to demonstrate the amount of the loss. Section 1245.060, by its terms, does not explicitly impose a burden of proof, but it does require a property owner to apply to obtain recovery from the deposited funds and a judgment for an additional award if the deposited funds are insufficient. (§ 1245.060, subds. (a), (c).) Contrary to the Court of Appeal's position, however, the governing California cases do not hold that the state takings

*(footnote continued on next page)*

Accordingly, we conclude that a classic condemnation proceeding is not required for precondemnation entry and testing.

### (b) Does the environmental order violate the takings clause by failing to provide for a jury trial on damages?

The Court of Appeal additionally concluded that the precondemnation entry and testing statutes are constitutionally deficient as applied to any environmental testing activities that amount to a taking or damaging of property for purposes of the state takings clause because the statutes do not provide a property owner with a right to have a jury determine the amount of just compensation to which the property owner is entitled. There is no dispute that the California takings clause guarantees a property owner whose property has been taken or damaged for public use a right to have the amount of just compensation ascertained by a jury, if the property owner so chooses. (Cal. Const., art. I, § 19, subd. (a); see, e.g., *Highland Realty Co. v. City of San Rafael* (1956) 46 Cal.2d 669, 683; *Citizens Utilities Co. v. Superior Court*, *supra*, 59 Cal.2d at p. 816.) Nonetheless, for the reasons discussed hereafter, we conclude that the precondemnation entry and testing statutes may not properly be held unconstitutional on this ground.

---

*(footnote continued from previous page)*

clause prohibits any procedure that requires the property owner to establish what it has lost as a result of a public entity's alleged taking. As this court explained in *Ricards*, *supra*, 10 Cal.3d at p. 390, footnote 4: "Where an owner is unable to prove that the taking or damaging of property by a governmental entity has caused him any economic injury, he is entitled to recover only nominal damages." (See also § 1260.210 [in a classic condemnation proceeding, "[t]he defendant [i.e., the property owner] shall present his evidence on the issue of compensation first"].)

It is true that the relevant provision of the precondemnation entry and testing statutes — section 1245.060 — does not afford a property owner the right to a jury trial on the measure of damages within the precondemnation proceeding itself. Instead, section 1245.060 grants both the public entity and the property owner what the Legislative perceived to be the benefit of a more expeditious and streamlined procedure for obtaining recovery for any damage or interference with use or possession that may result from the authorized precondemnation entry and testing activities, by having such damages determined by the trial court. (§ 1245.060, subd. (c).)

In defending the validity of the statutory scheme, the Department points out that section 1245.060, subdivision (a), expressly provides that "the owner may recover for such damages or interference *in a civil action* or by application to the court under subdivision (c)." (Italics added.) The Department argues that the jury trial requirement of the state takings clause is satisfied because a property owner can bring the civil action authorized under section 1245.060, subdivision (a), by filing a cross-complaint in the precondemnation proceeding itself, and the property owner would then be entitled to a jury determination of compensation in resolution of its cross-complaint in the precondemnation proceeding.

We agree that, by virtue of the jury trial provision of the state takings clause, a property owner would be entitled to a jury determination of compensation in the separate civil action expressly authorized under section 1245.060, subdivision (a). However, we do not believe the provisions of section 1245.060, construed as a whole, can reasonably be interpreted to permit the civil action provided for in subdivision (a) to be brought and litigated within the precondemnation proceeding itself. Nothing in the statute purports to permit such a civil action to be joined with the precondemnation proceeding in this fashion. Such joinder appears inconsistent with the language of subdivision (a) itself,

64

which states that a property owner may recover damages either in a civil action or by application to the court under subdivision (c). If the Legislature had intended to authorize the merged procedure proposed by the Department, the statute would not have been written in its present form.

Although we conclude that section 1245.060 as presently written does not afford a property owner the right to have a jury determine the amount of compensation within the precondemnation proceeding itself, and further agree with the Court of Appeal that the statute is constitutionally deficient in this respect, in our view the appropriate remedy for this constitutional flaw is not to invalidate the precondemnation entry and testing statutes as applied to any precondemnation testing activity that rises to the level of a taking or damaging of property for purposes of the state takings clause. Instead, we conclude that the appropriate remedy for this constitutional flaw is to reform the precondemnation entry statutes so as to afford the property owner the option of obtaining a jury trial on damages at the proceeding prescribed by section 1245.060, subdivision (c).

As this court explained in *Kopp v. Fair Pol. Practices Com.* (1995) 11 Cal.4th 607, 615: "[A] court may reform a statute to satisfy constitutional requirements if it can conclude with confidence that (i) it is possible to reform the statute in a manner that closely effectuates policy judgments clearly articulated by the enacting body, and (ii) the enacting body would have preferred such a reformed version of the statute to invalidation of the statute." In light of the legislative history of the precondemnation entry and testing statutes discussed above, it is clear that the Legislature intended to adopt a procedure that satisfies the requirements of the California takings clause. Further, providing a property owner the ability to obtain a jury determination of damages at the latter stage of the precondemnation proceeding will not interfere with or undermine the fundamental purposes or policies of the precondemnation entry and testing

65

legislation. Thus, we conclude that both prongs of the *Kopp* standard are satisfied here. Accordingly, the provisions of section 1245.060, subdivision (c), are reformed to provide a property owner the option of obtaining a jury trial on the measure of damages at the proceedings provided for in that subdivision.

### 2. Geological testing activities

As discussed above, both the trial court and the Court of Appeal held that the precondemnation entry and testing statutes violate the state takings clause as applied to the Department's proposed geological testing activities. These courts reasoned that because the Department proposed to fill the holes that it bored in the property with a type of grout that would be left in the holes after the Department completed its investigatory activities, the geological activities amounted to a *permanent per se* taking of property under the United States Supreme Court's decision in *Loretto v. Teleprompter Manhattan CATV Corp.* (1982) 458 U.S. 419, 426 (*Loretto*). As a consequence, the proposed activity required the commencement of a classic condemnation action prior to conducting such activities.

The Department's proposed boring and refilling of deep holes in the properties in question — along with the Department's exclusive possession of the worksite area surrounding the boring sites for the 1 to 14 days needed to conduct the drilling activities — may cause substantial interference with the landowner's possession and use of a portion of its property during the time the drilling activities are occurring. At the same time, however, under the precondemnation entry and testing statutes, a landowner is entitled to be compensated for any such interference with the owner's possession and use of the property, as well as for any actual damage to the property caused by the CPT and drilling activities. The landowners maintain that recovery under the precondemnation statutes for any actual damage or substantial interference with possession or use of the property is

66

not sufficient.  They argue that the proposed boring and refilling activity must be viewed as the kind of *permanent* appropriation of a property interest that may only be undertaken by first commencing a classic condemnation action, rather than by proceeding under the precondemnation statutes.  As explained, we disagree with the landowners' contention on a number of grounds.

First, in our view it is doubtful that the proposed boring and filling activity is properly characterized as a *permanent occupation* of property, and therefore a per se taking, for *federal* constitutional purposes.  In *Loretto*, *supra*, 458 U.S. 419 — upon which the lower courts relied — the United States Supreme Court phrased the question before it as "whether a minor but permanent physical occupation of an owner's property authorized by government constitutes a 'taking' of property for which just compensation is due under the Fifth and Fourteenth Amendments of the Constitution."  (*Id.* at p. 421.)  In that case, a New York statute provided that a residential landlord was required to permit a cable television company to install cables and a cable box on the landlord's property.  The New York Court of Appeals had ruled that because the required installation served a legitimate police power purpose and did not have an excessive economic impact on the landlord's property rights or its reasonable investment-backed expectations, the statute did not constitute a taking of the landlord's property for purposes of the federal takings clause.  (*Id.* at p. 425.)

In reversing the New York court's ruling, the majority in *Loretto*, *supra*, 458 U.S. 419, drew a distinction "between a permanent occupation and a temporary physical invasion" of property (*id.* at p. 434), and held that "when [a] physical intrusion reaches the extreme form of a permanent physical occupation, a taking has occurred."  (*Id.* at p. 426.)  In that case, because "[t]he installation involved a direct physical attachment of plates, boxes, wires, bolts, and screws to the building" (*id*. at p. 438), and because "[s]o long as the property remains

residential and a [cable] company wishes to retain the installation, the landlord must permit it []" (*id.* at p. 439), the high court found that the required installation amounted to a permanent physical occupation and thus constituted a taking of property without regard to the economic impact of the requirement. (*Id.* at p. 441.) At the same time, the court recognized that "the *extent* of the occupation [is] one relevant factor in determining the compensation due" (*id.* at p. 437, fn. omitted), and noted that in that case "[t]he issue of the amount of the compensation that is due, on which we express no opinion, is a matter for the state courts to consider on remand." (*Id.* at p. 441, fn. omitted.)

Unlike the cable box in *Loretto*, which was owned and controlled by the cable company and which the property owner was not permitted to remove, the Department will retain no continuing interest in the grout after its testing activities are completed. If a landowner chooses, it may remove the grout at any time and replace it with any substance it desires (so long as, of course, the substance complies with any applicable health and water regulations). In our view, the *Loretto* decision cannot properly be interpreted to mean that a public entity that, after digging up soil or conducting other activities on private property that temporarily alter the property's condition, returns the property to the same or a comparable state as the property previously enjoyed, is to be viewed as having undertaken a permanent physical occupation of the property that amounts to a per se taking of a property interest. A public entity's restoration of property to the equivalent of its prior state is not the same as a public entity's authorizing a third party to attach a structure or fixture to a property owner's property when the structure or fixture continues for an unspecified period to be controlled by the third party. Because here the Department would not retain possession of or any interest in the filling material after its testing is completed, the proposed geological activities do not involve any continued or permanent occupation of any

68

portion of the landowners' property that would effectively impinge upon the owner's right to possess, use, or control the area in question. Under these circumstances, in our view the proposed drilling and refilling would not constitute a permanent physical occupation of a landowner's property within the meaning of the *Loretto* decision.[30]

Second, even if leaving grout in the holes bored on the landowners' properties were properly viewed as a permanent physical occupation and, as such, a per se taking of property for purposes of the federal takings clause under *Loretto*, an order under the precondemnation entry and testing statutes authorizing such geological activity still would not violate the federal takings clause. As previously explained, because the precondemnation entry and testing statutes provide a procedure by which a property owner may recover damages for any actual injury or substantial interference with the property owner's possession or use of its property that is caused by the continued presence of the grout on its property, the

---

[30] In contending that the proposed geological activities would work a permanent physical occupation, the landowners rely heavily on dicta in *Hendler v. United States* (Fed. Cir. 1991) 952 F.2d 1364, 1376, discussing the permanency requirement of *Loretto*. However, in a subsequent decision by the same circuit — *Boise Cascade Corp. v. United States* (Fed. Cir. 2002) 296 F.3d 1339 — the court stated that the cited language in *Hendler* "has been widely misunderstood" (296 F.3d at p. 1356) and explained: "Putting its dicta to one side, *Hendler*'s holding was unremarkable and quite narrow: it merely held that when the government enters private land, sinks 100-foot deep steel reinforced wells surrounded by gravel and concrete, *and thereafter proceeds to regularly enter the land to maintain and monitor the wells over a period of years*, a per se taking under *Loretto* has occurred." (*Id.* at p. 1357, italics added.) The facts of *Hendler* are quite different and distinguishable from the proposed geological activities at issue in this case.

statutes do not on their face violate the federal takings clause. (See *ante*, pp. 32-33.)[31]

Third, even if we assume that the Department's proposed geological activities are sufficiently similar to the activities at issue in *Jacobsen*, *supra*, 192 Cal. at page 238, that the proposed activities would constitute a taking or damaging of property for purposes of the state takings clause under the holding in *Jacobsen*, an order authorizing such geological activities pursuant to the procedures set forth in the current precondemnation entry and testing statutes would not violate the state takings clause. As discussed above with reference to the environmental order, the state takings clause does not always require a public entity to institute a classic condemnation action before it engages in conduct that may result in a taking or damaging of property for which just compensation must be paid under the state takings clause. With respect to the proposed geological testing, as with the authorized environmental testing, the Department is not seeking to obtain title to private property, to permanently maintain bored holes on the landowners' property, or to obtain exclusive possession of any portion of the property for a significant period of time.[32]

---

[31] We note in this regard that on remand from the United States Supreme Court's decision in *Loretto*, *supra*, 458 U.S. 419, the New York Court of Appeals concluded that even if the challenged New York statute worked a per se taking of a landlord's property, the New York statute nonetheless did not violate the federal takings clause because the statute permitted a landlord to obtain damages — just compensation — for any loss sustained as a result of the statute's requirements. (See *Loretto v. Teleprompter Manhattan CATV Corp.* (N.Y. 1983) 446 N.E.2d 428, 432-433, 448.)

[32] Because no permanent physical occupation of property is involved here, we have no occasion to determine what procedure would be required under the state takings clause in the event that precondemnation testing required such activity.

Under the precondemnation entry and testing statutes, a landowner has the opportunity to object to the proposed geological activities and to propose limitations on drilling activities that would eliminate or minimize any potential interference with the landowner's continued use of its properties during the period in which the geological activities are undertaken. The landowner may present evidence regarding the amount of funds that the Department should be required to deposit in advance of its entry and undertaking of the geological activities to compensate the property owner for any loss sustained as a result of those activities. As the trial court's order with respect to the environmental activities demonstrates, under the applicable statutes a trial court is required to take into account the property owner's legitimate objections and concerns in devising the conditions under which any geological testing may proceed and in determining the amount of funds that the public entity is required to deposit before undertaking such testing.

For the reasons set forth in our discussion relating to the environmental order, we conclude that the precondemnation entry and testing statutes — by requiring the Department to obtain a court order prior to undertaking the geological testing activities, authorizing the trial court to limit the activities in a manner that protects the interests of the property owner, requiring the Department to deposit in court an amount that the court determines is sufficient to cover the damages that may result from the authorized activities, and authorizing a landowner to recover damages for any actual damage to the property or substantial interference with the owner's possession and use of the property resulting from the

71

Department's geological activities — satisfy the requirements of the California takings clause as applied to the proposed geological testing.[33]

Accordingly, we conclude that the trial court and Court of Appeal erred in determining that the state takings clause precluded the trial court from issuing an order, pursuant to the precondemnation entry and testing statutes, that would authorize the Department to conduct the proposed geological activities on the properties at issue.

---

[33] The landlords have cited a number of out-of-state cases that hold, consistent with our *Jacobsen* decision, that when a public entity intends to conduct deep drilling as part of precondemnation testing, the drilling activity would constitute a taking or damaging of property for purposes of the applicable state takings clause and that, in such a case, a classic condemnation action must be instituted. (See, e.g., *County of Kane v. Elmhurst Nat. Bank* (Ill.Ct.App. 1982) 443 N.E.2d 1149, 1154; *Missouri Highway & Transportation Com. v. Eilers* (Mo.Ct.App. 1987) 729 S.W.2d 471, 473-474; *Burlington No. & S.F. Ry. V. Chaulk* (Neb. 2001) 631 N.W.2d 131, 140;.) None of the jurisdictions in question, however, had adopted a statutory scheme comparable to California's current precondemnation entry and testing statutes, in which a public entity, prior to engaging in such drilling activities, must obtain a court order and deposit in court an amount that the court determines is probable compensation for any loss that may be caused by the authorized drilling. Thus, none of the decisions upon which the landlords rely is inconsistent with the conclusion reached here. (Cf. *Mackie v. Mayor & Comm'rs of Elkton* (Md. 1972) 290 A.2d 500, 506 ["We shall not undertake to say here that prior payment or the tender of payment is a *sine qua non* for entries and activities looking to the acquisition of the 'information' [i.e., data from subsoil testing] appellees say they must have. *It seems reasonable to suppose that the Legislature will devise a mechanism which will be adequate, equitable and valid.*" (Italics added.)].)

## IV. Conclusion

For the reasons discussed above, the judgment of the Court of Appeal is reversed in its entirety, and the matter is remanded to the Court of Appeal for further proceedings consistent with this opinion.[34]

**CANTIL-SAKAUYE, C. J.**

**WE CONCUR:**

**WERDEGAR, J.**
**CHIN, J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

---

[34] In light of its constitutional ruling, the Court of Appeal did not reach a number of additional issues raised by the landowners on appeal, including the validity of the trial court's rulings with regard to the availability of discovery in a precondemnation proceeding and the right of lessees or easement holders to participate in such a proceeding. The Court of Appeal may address those issues on remand.

**CONCURRING OPINION BY LIU, J.**

I agree with the results the court reaches today. But as to the holding that California Constitution, article I, section 19, subdivision (a) (hereafter article I, section 19(a)) does not require the Department of Water Resources (Department) to initiate a classic condemnation proceeding before conducting its proposed environmental and geological testing activities, I am not persuaded by the court's reasoning and would reach this holding on different grounds.

In this case, the Department sought judicial authorization under the precondemnation entry and testing statutes (Code Civ. Proc., §§ 1245.010–1245.060) to engage in certain environmental and geological testing activities as a preliminary step to possibly condemning property for use in new water conveyance facilities. The question is whether such activities and the statutory procedures that authorize them are consistent with article I, section 19(a), which states: "Private property may be taken or damaged for a public use and only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner. The Legislature may provide for possession by the condemnor following commencement of eminent domain proceedings upon deposit in court and prompt release to the owner of money determined by the court to be the probable amount of just compensation."

Today's opinion says the second sentence of this provision authorizes a public agency to conduct testing activities that may result in taking or damage to

1

property without first paying the owner, so long as certain protections enacted by the Legislature are observed.  (Maj. opn., *ante*, at p. 55 ["[A]lthough the second sentence of article I, section 19, subdivision (a) of the California Constitution may not have been drafted with the precondemnation setting in mind, in fashioning the precondemnation entry and testing statutes the Legislature, acting under the authority granted by that sentence, has provided comparable protections to the property owner so as to satisfy the requirements of the state takings clause."].)  By its plain terms, the second sentence of article I, section 19(a) speaks of legislatively enacted procedures that apply "following commencement of eminent domain proceedings."  In the court's view, a petition to obtain an order for precondemnation testing (Code Civ. Proc., § 1245.030) is an "eminent domain proceeding" within the meaning of article I, section 19(a).  (Maj. opn., *ante*, at p. 53, fn. 20.)  I respectfully disagree.

When construing a constitutional provision, " '[i]t is to be presumed, in the absence of anything in the context to the contrary, that the words were used in the ordinary acceptation and as defined by the statutes in force at the time.' " (*State M. B. & L. Assn. v. Los Angeles* (1939) 30 Cal.App.2d 383, 385.)  Under the Eminent Domain Law, "[a]n eminent domain proceeding is commenced by filing a complaint with the court." (Code Civ. Proc., § 1250.110.)  The filing of a complaint initiates a condemnation proceeding, and the public agency is required to give any interested persons a clear description of "the property sought to be taken." (*Id.*, § 1250.120.)  This was the meaning of the phrase "commencement of eminent domain proceedings" at the time of article I, section 19's enactment in its current form in 1974.  (See *Mt. San Jacinto Community College Dist. v. Superior Court* (2007) 40 Cal.4th 648, 657.)  The Eminent Domain Law referred to a "proceeding in eminent domain" as a proceeding in which a complaint is filed *to condemn property*.  (See Code Civ. Proc., former § 1243, as amended by Stats.

2

1963, ch. 70, § 1, p. 698; *id.*, former § 1243.4, added by Stats. 1961, ch. 1613, § 1, p. 3442; *id.*, former § 1243.5, added by Stats. 1957, ch. 1508, § 1, p. 2840.) When the Legislature reenacted the Eminent Domain Law in its present form in 1975 (Stats. 1975, ch. 1275, § 2, p. 3409) shortly after the enactment of article I, section 19(a), it was presumably aware of that constitutional provision and used the term "eminent domain proceeding" with that provision in mind. (See *California Housing Finance Agency v. Elliott* (1976) 17 Cal.3d 575, 595.)

A petition to enter property for precondemnation activities pursuant to Code of Civil Procedure section 1245.030 is by definition not an action to condemn property, and it is therefore not the commencement of an "eminent domain proceeding" as that term has long been used in statute. Further, there is no indication that the term means something different in article I, section 19(a). To the contrary, article I, section 19(a) uses the term "eminent domain proceeding" in the same sense as the Eminent Domain Law does. As the court acknowledges, the second sentence of article I, section 19(a) "was adopted primarily to give the Legislature broad authority to enact a so-called quick take statutory procedure that fairly protects the interests of both public entities and property owners. [Citations.] Through the current statutory quick take procedure (§ 1255.010 et seq.), a public entity that has already determined that it intends to acquire a specific property for public use may, *after taking the steps necessary to commence a classic condemnation action*, obtain exclusive possession of the property and begin construction of the project before the typically lengthy classic condemnation action has fully run its course and a jury determination of just compensation has been made." (Maj. opn., *ante*, at pp. 35–36, italics added.)

The court says that because the Legislature has made the precondemnation statutes a part of the Eminent Domain Law, a petition to gain precondemnation entry for testing activities qualifies as the commencement of an eminent domain

3

proceeding.  (Maj. opn., *ante*, at p. 53, fn. 20.)  But the court cites nothing to rebut the presumption that the Legislature and those who enacted the constitutional provision had a common understanding of that term.  Against the backdrop of settled usage equating an "eminent domain proceeding" with a classic condemnation action, it is unpersuasive to infer that the Legislature intended a precondemnation action to qualify as an eminent domain proceeding without some specific indication to that effect.  Neither the fact that the precondemnation statutes are part of the Eminent Domain Law nor the fact that the California Law Revision Commission made the general statement, without mentioning the precondemnation statutes, that the Eminent Domain Law was " 'intended to supply rules for eminent domain proceedings' " (maj. opn., *ante*, at pp. 53–54, fn. 20, citing The Eminent Domain Law (Dec. 1975) 13 Cal. Law Revision Com. Rep. 1007, 1009, fn. 2) provides a firm basis for inferring the Legislature's intent to alter the consistent meaning of "eminent domain proceeding" that the statute itself has stated in its many iterations.  (Code Civ. Proc., §§ 1250.110, 1250.120; *id.*, former §§ 1243 [as amended in 1963], 1243.4 [enacted in 1961], 1243.5 [enacted in 1957].)

Indeed, in the report cited by the court, the Commission said in its comments on Code of Civil Procedure section 1245.010:  "Although appraisal and suitability studies generally precede the commencement of the eminent domain proceeding, Section 1245.010 does not preclude such studies after *the proceeding to acquire the property* has been commenced."  (The Eminent Domain Law, *supra*, 13 Cal. Law Revision Com. Rep. at p. 1119, italics added.)  Thus, the Commission understood the term "eminent domain proceedings" in the conventional sense to mean a "proceeding to acquire . . . property" and as something distinct from the commencement of "appraisal and suitability studies" in the precondemnation statutes.

4

Instead of trying to shoehorn the precondemnation procedure into the second sentence of article I, section 19(a), I would hold that article I, section 19(a)'s requirement that a public agency commence a classic condemnation proceeding before taking property does not apply to situations where there is genuine uncertainty as to whether or to what extent a taking or any damage will occur. The purpose of California's takings clause is not to prevent the government from undertaking legitimate activities, but to ensure that the government pays just compensation if those activities result in a taking or damage to property. Article I, section 19(a) could not have been intended to require the impossible: It could not have been intended to require a jury ascertainment of just compensation where the extent of any taking or damage is uncertain before the government actually undertakes its proposed activities. In contrast to a classic condemnation action, which requires the government to know and to clearly specify what property will be taken (Code Civ. Proc., § 1250.310, subd. (b)), a proceeding to authorize precondemnation testing activities often presents circumstances where the extent of any taking or damage will be unclear until the activities are completed. In such circumstances, the entry and testing activities authorized by the precondemnation statutes do not require the commencement of a classic condemnation proceeding.

In this case, the trial court's order authorizing the Department to enter the property and conduct environmental testing activities provided a maximum number of days that the Department had a right of entry and a range of activities that the Department could undertake. (Maj. opn., *ante*, at pp. 8–9.) It was uncertain at the time the order was entered how many days the Department would actually enter each property, precisely what activities it would undertake, and whether and to what extent those activities would damage the property or substantially interfere with its use. Similarly, the extent of any taking or damage to property resulting from the proposed geological testing activities was uncertain

5

at the time the trial court entered its order. In enacting an orderly process to provide for both legitimate government testing activities and just compensation in the face of such uncertainties, the Legislature addressed circumstances to which the second sentence of article I, section 19(a) does not apply. Accordingly, the Department was not required to commence classic condemnation proceedings before conducting its testing activities. It could defer compensation to the property owner in the manner provided in the precondemnation statutes.

In all other respects, I join the court's opinion.


**LIU, J.**

*See last page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Property Reserve, Inc. v. Superior Court
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 224 Cal.App.4th 828
**Rehearing Granted**

_____

**Opinion No.** S217738
**Date Filed:** July 21, 2016
_____

**Court:** Superior
**County:** San Joaquin
**Judge:** John P. Farrell*

_____

**Counsel:**

Matteoni, O'Laughlin & Hechtman, Norman E. Matteoni, Gerry Houlihan; Kirton & McConkie and Christopher S. Hill for Petitioner Property Reserve, Inc.

Freeman, D'Aiuto, Pierce, Gurev, Keeling & Wolf, Thomas H. Keeling, Arnold J. Wolf; Nomellini, Grilli & McDaniel and Dante J. Nomelini, Jr., for Petitioners Mark G. Scribner, Jr., Randy J. Baranek, Siara Andrews, J.H. Jonson & Sons, Inc., Arnaudo Bros., Delta Wetlands Properties, The 2000 teVelde Family Trust, The Biagi Living Trust Agreement, The Carolyn Nichols Revocable Living Trust dated 12/09/1999, Carolyn A. Nichols as Trustee, Venice Island, Coney Island Farms, Inc., Robert A. DalPorto, Jr., Islands, Inc., Richard Brann as Trustee, S.S. & S.M. Oates Family Trust, Wilson Vineyard Properties, Eileen V. Nichols Revocable Living Trust dated 12/09/1999, Eileen V. Nichols as Trustee, Victoria Island, L.P., Lucille L. Christensen Family Trust dated 8/31/2004, Lucille J. Christensen as Trustee, Smith and Karen Cunningham, Zuckerman Mandeville, Inc., and Heritage Land Co., Inc.

Downey Brand and Scott D. McElhern for Petitioners CCRC Farms, LLC and Tuscany Research Institute.

Somach Simmons & Dunn, Stuart L. Somach and Daniel Kelly for Petitioners Sutter Home Winery, Inc., and Delta Ranch Partnership.

J. David Breemer and Jonathan Wood for Pacific Legal Foundation as Amicus Curiae on behalf of Petitioners.

Luke A. Wake; Damon Key Leong Kupchak Hastert, Robert H. Thomas; Manatt, Phelps & Phillips and Edward G. Burg for Owners' Counsel of America and National Federation of Independent Business Small Business Legal Center as Amici Curiae on behalf of Petitioners.


*Retired judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**Page 2 – S0217738 – counsel continued**

**Counsel:**

Jenny & Jenny and Scott E. Jenny as Amici Curiae on behalf of Petitioners.

Nancy N. McDonough and Kari E. Fisher for California Farm Bureau Federation as Amicus Curiae on behalf of Petitioners.

No appearance for Respondent.

Kamala D. Harris, Attorney General, Steven M. Gevercer and Kristin G. Hogue, Assistant Attorneys General, Alberto González, John M. Feser, Jr., Michael P. Cayaban, James C. Phillips, Neli N. Palma and Gregory D. Brown, Deputy Attorneys General, for Real Party in Interest.

Jeanne Scherer, David Gossage and Lucille Y. Baca for California Department of Transportation as Amicus Curiae on behalf of Real Party in Interest.

Meyers, Nave, Riback, Silver & Wilson and David W. Skinner for League of California Cities, California State Association of Counties and Association of California Water Agencies as Amici Curiae on behalf of Real Party in Interest.

Woodruff, Spradlin & Smart, Gary C. Weisberg and Laura A. Morgan for Orange County Transportation Authority as Amicus Curiae on behalf of Real Party in Interest.

Stephanie D. Morris for State Water Contractors as Amicus Curiae on behalf of Real Party in Interest.

Best, Best & Krieger, Stefanie D. Hedlund and Kendall H. MacVey for Riverside County Transportation Commission as Amicus Curiae on behalf of Real Party in Interest.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Norman E. Matteoni
Matteoni, O'Laughlin & Hechtman
848 The Alameda
San Jose, CA  95126
(408) 293-4300

Thomas H. Keeling
Freeman, D'Aiuto, Pierce, Gurev, Keeling & Wolf
1818 Grand Canal Boulevard, Suite 4
Stockton, CA  95207
(209) 474-1818

Gregory D. Brown
Deputy Attorney General
1300 I Street
Sacramento, CA  95814
(916) 445-2482